Nathan Riordan
WENOKUR RIORDAN PLLC
600 Stewart Street, Suite 1300
Seattle, WA 98101
(206) 903-0401

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA

| In re:<br><br>47 HOPS LLC,<br><br>Debtor. | No. 17-02440<br><br>DECLARATION OF DOUGLAS MACKINNON IN SUPPORT OF MOTION TO APPROVE INTERIM USE OF CASH COLLATERAL |
|---|---|

I, Douglas MacKinnon, declare the following:

1. I am over 18 years of age, am familiar with the Debtor's finances, books, and records, have personal knowledge of the facts herein, and I am competent to testify to them.

2. My wife, Anastasia MacKinnon, and I are members of 47 Hops LLC, and I am the president of 47 Hops LLC.

3. I prepared the 30-day cash flow budget attached as Exhibit A and the 6 month budget attached as Exhibit B based on my 19 years' experience

DECLARATION OF DOUGLAS MACKINNON

Page 1 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11   Doc 3-1   Filed 08/11/17   Entered 08/11/17 16:09:05   Pg 1 of 12

owning and operating the Debtor. I believe the attached projections and budget are reasonable and attainable by the Debtor.

4. The Debtor is a merchant/wholesaler of hops and hop products whose business and operations are all located in Yakima, Washington.

5. The Debtor derives its revenue from the processing, sale, storage, and delivery of hops and hop products. The Debtor purchases hops and hop products primarily from growers, processes the hops into pellet form, and then sells the baled hops to beer brewers in the U.S. and abroad.

6. My wife and I formed 47 Hops LLC ("47 Hops" or the "Debtor") in January of 2013 and own 100% of the Debtor, which primarily purchases hops and hop products from growers, processes the hops into pellet form, and then sells the processed hops to beer brewers in the U.S. and abroad.

7. The Debtor has contracts with 11 hops growers to purchase their hops and hop products. These grower contracts typically span three to five years of hops planting, harvesting, and delivery to the Debtor's processing and storage facility in Yakima, Washington. The Debtor then processes the hops into pellet form, packages them in air-tight mylar foils and stores them at temperatures at or below freezing. The Debtor then sells the hops to brewers/breweries on both a

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 2 of 12

contract and spot-market[1] sales basis. The Debtor has 150+ contracts with brewers/breweries for the sale of hops. Typically the brewery contracts also span a period of three years for storage at and delivery from the Debtor's facility.

8. The growth in the hops industry has been fueled by the popularity of the craft beer industry, which had been enjoying annual double-digit growth for some years. Growth in the craft beer industry peaked at 18% in February 2014. Since then, growth in the craft beer market has decreased to its current level of approximately 6% year on year in 2016, according to a Brewers Association press release on March 28, 2017.

9. Optimism surrounding the double-digit growth of the craft beer industry continued much longer than the actual growth itself. Farmers continue to this day to plant additional acreage with the reasoning that all their hops are contracted, despite information that brewers are not paying in a timely manner on the contracts. Copious articles and statistics published by the Brewers Association and others proclaiming the craft beer industry was on track to reach 20% of domestic U.S. beer production by 2020 dominated the industry news, fueled the frenzy, and further supported the belief that additional hops acreage was necessary.

---

[1] "Spot-market" sales are sales that fill an immediate, short-term demand.

DECLARATION OF DOUGLAS MACKINNON

Page 3 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 3 of 12

10. The overly optimistic atmosphere in the hop industry continued unchallenged through 2015 and into the beginning of 2016. Brewers enjoyed annual double-digit growth of their most popular brands for several years. Variety shortages gave the impression of overall shortages to many brewers who, with a false sense of confidence, were comfortable signing long-term contracts for hops at high prices. Growers continued to plant for those contracts. In 2016, when the slow-down in the craft beer market became obvious, many brewers began asking for contract renegotiations. Slowing growth happened first among the largest craft brewers where competition was fierce. In the early stages of the slow-down, growth by small- and medium-sized brewers absorbed reductions from the larger brewers' contracts. Merchants absorbed this round of renegotiations by shuffling inventory from the haves to the have-nots.

11. The hop industry, eager to take advantage of a growth opportunity, borrowed hundreds of millions of dollars from banks based on forward contracts with merchants and farmers. Brewers borrowed heavily to expand their production capacity as well. By 2016, the majority of the brewing and hop-related industries were heavily leveraged. This is significant, because it meant cash flow was tight everywhere. It placed banks firmly in control of the hop

DECLARATION OF DOUGLAS MACKINNON

Page 4 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 4 of 12

industry thereby reducing options and necessitating that all activities are geared toward bank repayment.

12. The heavy influx of bank money created a vicious cycle. To fund investments in infrastructure, farmers required stability in the form of long-term contracts. Brewers quickly and happily signed long-term contracts of 3-5 years to beat the ever-increasing prices of merchants and farmers. Costs of production increased across the industry due to the influx of bank-controlled money, but sales prices in the hop industry are not tied to costs. They soared even higher than the debt and justified creating what can only be described as "irrational exuberance." The bubble continued to grow.

13. By the end of 2016, brewers and merchants could not match their hop contract volumes to the newly reduced level of demand on the craft beer market. The result was oversupply building up in warehouses across Yakima, as evidenced by the USDA stocks report of March 2017. It became nearly impossible to shuffle inventory between brewers who had surplus hops and those who needed them-- the volume of surplus hops was simply too large. Burdened with debt and clinging to the belief that a contracted position was as good as money in the bank, many farmers and some merchants refused to renegotiate brewer contracts when opportunities arose. In some isolated cases

DECLARATION OF DOUGLAS MACKINNON

Page 5 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 5 of 12

the Debtor was guilty of this, although if reasonable renegotiation of a contract was possible in 2016, the Debtor pursued that route. Realizing the seriousness and scale of the situation, the Debtor became much more flexible with respect to time and renegotiations. Brewers who were unable or unwilling to renegotiate their contracts began to delay deliveries and their corresponding payments, thereby creating a stockpile of contracted hops in merchant inventory, including in the stores of 47 Hops.

14. At the time of filing of the Debtor's bankruptcy, the Debtor is aware of large breweries that are only now making payments on their 2015 crop-year inventory to other merchants. Older inventory is also available. The Debtor has approximately $75,000 of 2015 inventory held for brewers, which at the time of this writing has not yet been paid. The amount of 2016 inventory held for brewers for which the Debtor still must be paid is nearly $2 million.

15. In January 2017, it was clear that the current situation with slowed brewer payments and on-time grower payments would not be sustainable without an ever-increasing line of credit. The Debtor began a series of talks with its largest American hop supplier to explore the possibility of renegotiating contracted positions and lowering the volumes considerably. At that time, the Debtor was open to the idea of reducing volumes and extending the number of

DECLARATION OF DOUGLAS MACKINNON

Page 6 of 12

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 6 of 12

years of the contracts in place, a practice common in the industry. The Debtor also offered a nominal sum per pound to be paid. Unfortunately, the supplier was not enthusiastic about renegotiating its contracted position and offered a buy-out price that equaled approximately 50% of the face value of the contract per year. This was not a viable option in an increasingly oversupplied market. Without the cooperation of the Debtor's largest single supplier, introducing the topic of renegotiation with other suppliers was futile.

16. As planting commenced in the spring of 2017, it was clear that the majority of farmers were still of the opinion that the market was growing. American farmers planted an additional 4,500 acres. However, at the same time, one of the Debtor's largest brewery customers delayed payment of nearly $2 million. As a result, 47 Hops was unable to make the timely March/April payment to several growers. Instead, the Debtor offered a payment plan solution that included three equal monthly payments on the 15th of April, May, and June 2017. The Debtor's largest supplier immediately threatened to file a processor lien if 47 Hops did not make full payment within 20 days of the original due date. On the final day of that deadline, the Debtor and the grower signed an amendment to the agreement effectively giving the Debtor 30 more days to pay the entire amount in full. Other suppliers accepted the original payment plan and

DECLARATION OF DOUGLAS MACKINNON

Page 7 of 12

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 7 of 12

quickly agreed to the new terms, and 47 Hops made all those payments per the revised plans. The Debtor's largest supplier remained inflexible to renegotiation unless it was well compensated for such a change. Again, without their cooperation, it was futile for 47 Hops to try negotiating more favorable terms and conditions with other suppliers.

17. At the end of 2016 and the beginning of 2017, large brewers began to aggressively try to sell off their excess inventory. As a result, low spot-market prices between brewers and merchants, and also between brewers, were commonplace. It was obvious that, under current market conditions, a buy-out payment at anything near 50% of contract face value would be impossible. It was also obvious that with the market quickly moving into a heavily oversupplied surplus condition due to continued planting by farmers, the situation would become more extreme as time progressed. As of July 2017, word on the street is that there is already an additional 1,800 acres of hops planned for 2018. The momentum and enthusiasm among farmers to continue planting contracted hops will ensure that prices on the spot hop market will continue to be significantly lower than contracted prices.

18. My wife and I own 100% of the Debtor, and our combined knowledge of and experience in the hops industry is vast. I am president of the

DECLARATION OF DOUGLAS MACKINNON

Page 8 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 8 of 12

Debtor and have worked in the hops industry since 1999. I have served as Director of Hop Growers of America and as Chairman of the Economic Committee of the International Hop Growers Convention, and have written and maintained a blog on the hops and hops-related industries on the Debtor's website for many years. My wife, Anastasia MacKinnon, has been involved in the hops industry for over a decade. Anastasia is Vice President of Sales and International Business Development, and transacts Debtor domestic and international business in four languages.

19. The Debtor plans to reject almost all of the Debtor's grower contracts in order to free itself from the obligation to purchase hops at above-market prices. The Debtor will then purchase hops on the spot market at market prices from brewers and farmers willing to sell to it. Once free to float in the market and source hops at current market prices, the Debtor can then sell hops to brewers at competitive prices. Currently, the Debtor's contracts with brewers suffer from two problems. First, many of the contracts are priced above today's market, thereby incentivizing brewers to breach their contracts. The Debtor has found suing for breach and attempting to collect on judgments to be very expensive, frustrating, and an overall bad business practice. Second, because demand has softened, many of the brewers have surplus hops and do not need

DECLARATION OF DOUGLAS MACKINNON

Page 9 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 9 of 12

the amounts for which they originally contracted with the Debtor. Therefore, rejecting the contracts for purchase will allow the Debtor to aid the customer by realigning their contracted volumes with their actual needs at competitive market prices.

20. The Debtor's contacts within the hops market will enable the Debtor to find hops to purchase despite the Debtor's mass rejection of grower contracts. The surplus of hops everywhere in the market means that many parties will be eager to sell hops even at sharply reduced prices, rather than lose the hops to spoilage.

21. The Debtor maintains a competitive advantage due to the Debtor's knowledge of both the domestic and international hops markets on both the buy and sell side, including a broad familiarity with varieties of hops specific to different regions all over the globe. The Debtor is confident that, once freed from unprofitable contracts, it can take advantage of the Debtor's knowledge of the needs and preferences of the players in the hops industry world-wide to continue to make profitable sales of hops in sufficient quantities to be a viable ongoing business.

22. The Debtor owes Columbia Bank (the "Bank") approximately $4.5 million for a line of credit, and has guaranteed an additional $2.3 million owed

DECLARATION OF DOUGLAS MACKINNON

Page 10 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 10 of 12

to Columbia Bank by an affiliate. Columbia Bank's line of credit is secured by a security interest in all of the Debtor's inventory and accounts receivable.

UCC: inventory (as of 8/11/17): $3,415,000

A/R (as of 8/11/17): $320,000

Bank accounts: $128,000

23. The Debtor's regular payment to Columbia Bank is approximately $18,750 per month. Debtor proposes to continue to pay Columbia Bank's regular debt service as adequate protection, as described below.

24. The Debtor estimates its total forced liquidation value is approximately $1,200,000, which estimate includes the forced 30-day liquidation value of the Bank's collateral, which is $962,630 for inventory, $160,000 (50%) for accounts receivable.[2] The estimate also includes $41,000 for equipment (50%), which is not the Bank's collateral. Whether using the cost value or the liquidation value of the inventory, the Bank is undersecured and not entitled to adequate protection in the form of interest payments. It is important to note that using the cost value of the inventory likely overstates the fair market value of the inventory due to the current market surplus. In addition, because the

---

[2] The Debtor's schedules reflect the value of the inventory on a cost basis at $3,415,777 and the accounts receivable at $320,000.

DECLARATION OF DOUGLAS MACKINNON

Page 11 of 12

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 11 of 12

Debtor's accounts receivable and cash balance will increase steadily over the next six months, depreciation is not a factor, and the Bank is therefore not entitled to an adequate protection payment to prevent diminution of the value of the Bank's collateral.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing statements are true and correct to the best of my information and knowledge.

DATED August 11, 2017, at Yakima, Washington.

*/s/ Douglas MacKinnon*
Douglas MacKinnon, President
47 Hops LLC

DECLARATION OF DOUGLAS MACKINNON

Page 12 of 12

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 3-1    Filed 08/11/17    Entered 08/11/17 16:09:05    Pg 12 of 12