**So Ordered.**

**Dated: April 4th, 2018**

Frank L. Kurtz
Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA**

In re:                                          No. 17-02440

47 HOPS LLC,                          ORDER APPROVING AMENDED
                                              DISCLOSURE STATEMENT AND SETTING
                                              DATES FOR CONFIRMATION OF FIRST
                            Debtor.        AMENDED PLAN OF REORGANIZATION

THIS MATTER came before the Court upon the Debtor's filing of a written

Disclosure Statement, Dkt. No. 266, and a proposed Plan of Reorganization, Dkt. No. 267, on

January 12, 2018. On April 3, 2018, the Debtor filed an Amended Disclosure Statement and a

First Amended Plan of Reorganization, Dkt. No. 355. The Court, having held a hearing on

April 4, 2018, and finding that proper notice was given, and having reviewed the Debtor's

Amended Disclosure Statement and proposed First Amended Plan of Reorganization, any

response in opposition thereto or in support thereof, and any reply thereto, and the files and

records herein, and concluding that the Debtor's Amended Disclosure Statement contains

adequate information regarding the Debtor's First Amended Plan of Reorganization; Now,

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 375    Filed 04/04/18    Entered 04/04/18 15:33:44    Pg 1 of 53

Therefore,

IT IS HEREBY ORDERED that

1.  The Debtor's Amended Disclosure Statement is approved with the following amendments with respect to the secured claim of Columbia State Bank, page 4, beginning line 8:

    a.  The estimated amount is amended from "$4,560,877.874" to "$4,561,044.38"; and

    b.  The explanation is amended from "Bank's counsel, as of 3/27/18: $4,499,833.49 plus expenses of $3,572.76 accrued interest and attorneys' fees and costs of $57,471.62" to the following:

        "Bank's counsel, as of 4/4/18: $4,499,833.49, plus expenses of $3,572.76 and any additional expenses due as of the Effective Date, interest accrued and owing through the Effective Date and attorneys' fees and costs of $57,471.62 through March 27, 2018, and all additional reasonable attorneys' fees and costs accrued through the Effective Date, less any payments received by the Class 1 Creditor prior to the date of the confirmation hearing."

2.  No further hearing on the Debtor's Amended Disclosure Statement is required.

3.  The Debtor's Amended Disclosure Statement, Debtor's First Amended Plan of Reorganization, and a Ballot substantially in the form attached to this Order, and this Order, shall be transmitted to the Master Mailing List pursuant to Fed.R.Bankr.P. 3017(d) on or before April 5, 2018.

4.  Written ballots for accepting or rejecting Debtor's First Amended Plan of Reorganization shall be due by or on May 4, 2018.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

5. The deadline for objections to confirmation of the Debtors' First Amended Plan of Reorganization is May 16, 2018. Any creditor, equity security holder, or other party in interest who objects to confirmation of the Debtor's First Amended Plan of Reorganization must file a written objection with the Clerk of the U.S. Bankruptcy Court, Union Station, 904 W. Riverside Ave., Suite 304, Spokane, WA 99201, and must serve a copy on the following:

> Nathan Riordan
> Wenokur Riordan PLLC
> 600 Stewart Street, Suite 1300
> Seattle, WA 98101

6. A status conference on confirmation or any filed objections will be held on May 22, 2018, at 1:30 P.M.; the number to call to participate is (509) 353-3192.

7. A confirmation hearing on the Debtors' First Amended Plan of Reorganization will be held on May 30, 2018, at 9:00 A.M. before the Honorable Frank L. Kurtz at 402 E. Yakima Ave., 2nd Floor Courtroom, Yakima, Washington.

/// End of Order ///

Presented by:

WENOKUR RIORDAN PLLC

*/s/ Nathan T. Riordan*
Nathan T. Riordan, WSBA #33926
600 Stewart St., Suite 1300
Seattle, WA 98101
(206) 903-0401
Attorneys for Debtor

ORDER APPROVING AMENDED DISCLOSURE STATEMENT AND
SETTING DATES FOR CONFIRMATION OF FIRST AMENDED PLAN
OF REORGANIZATION
Page 3 of 3

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 375    Filed 04/04/18    Entered 04/04/18 15:33:44    Pg 3 of 53

Nathan Riordan
WENOKUR RIORDAN PLLC
600 Stewart Street, Suite 1300
Seattle, WA 98101
(206) 903-0401

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA

| | |
|---|---|
| In re: | No. 17-02440 |
| 47 HOPS LLC, | DEBTOR'S AMENDED DISCLOSURE STATEMENT |
| Debtor. | |

Accompanying this Disclosure Statement is a Chapter 11 plan proposed by the above-named Debtor (the "Plan"). The Debtor attests that the information stated in this Disclosure Statement and the Plan is accurate. All Creditors should refer to the Plan for the specific treatment of their claim(s). This Disclosure Statement is explanatory only; the language used in the Plan is binding. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one.**

**EFFECTIVE DATE OF THE PLAN:** The Effective Date of the Plan is 14 days following the date of entry of the order confirming the Plan unless a stay of the confirmation order is in effect, in which case the Effective Date will be the first business day after the date on which the stay of the confirmation order has been lifted, provided that the confirmation order has not been vacated.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

## Part 1
## Proposed Treatment of Claims

**A.    Unclassified Claims: Administrative Priority Claims and Priority Tax Claims**

Holders of administrative priority claims are entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code including (i) professional fees and costs and (ii) United States Trustee's fees. Such claims shall be paid in full on, or as soon as practicable after, the Effective Date or upon allowance of such claim, whichever is later.

Holders of priority tax claims are entitled to priority under § 507(a)(8). Article 2 of the Plan addresses treatment of these claims. Such claims, if any, shall be paid in full over five years from the date of the entry of the order for relief with in equal annual amortized payments according to § 511 of the Bankruptcy Code, as stated in Article 2.

**B.    Secured Creditors** (Classes 1 and 2)

See Articles 4 and 5 of the Plan.

**(1)**    <u>Columbia Bank</u>: Lien secured by all Inventory and Accounts; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds; and the "Additional Lien" granted pursuant to authorization of the Debtor's use of cash collateral on (a) the Debtor's contracts with brewers for the sale of hops, (b) the Debtor's pellet mill and line, and (c) the promissory note owed by Doug MacKinnon to the Debtor (the "Additional Collateral"). The Additional Lien shall secure only the amount of the diminution in the value of the Bank's collateral, if any, as compared to the value as of the Petition Date that occurs as a result of the Debtor's use of Cash Collateral.

**(2)**    <u>Banner Bank</u>: Lien secured by 2007 Freightliner truck.

**C.    Guaranty Claim** (Article 6 of the Plan, Class 3)

Treatment of the creditor with a claim based upon a guaranty by the Debtor is dealt with in Article 6 of the Plan in Class 3.

**D.    General Unsecured Creditors** (Article 7 of the Plan, Class 4)

The treatment of general unsecured creditors is addressed in Article 7 of the Plan in Class 4. Because the amount of claims is currently unknown pending completion of motions to reject contracts and the filing of any related proofs of claims, the Debtor cannot estimate the percentage of claims that unsecured creditors will be paid based upon the plan payments. The

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Debtor will pay unsecured creditors $110,000 annually to be shared pro-rata amongst all unsecured creditors. A list of unsecured creditors is included as **Exhibit A** to this Disclosure Statement. The total amount to be paid to unsecured creditors under the Plan is $550,000. This is approximately two percent (2%) of the face amount of contracts the Debtor proposes to reject. Debtor anticipates that contract-rejection damages will be less than the face value of those contracts, but at this time, the Debtor is unable to determine the precise number. In addition, the Class 4 Creditors will receive a payment that reflects available Net Profit, if any, as defined and explained in the Plan, as well as a payment that reflects a percentage of the Warehouse Equity, as described and explained in the Plan.

### E. Equity Holders (Article 8 of the Plan, Class 5)

Equity Holders treatment is addressed in Article 8 of the Plan in Class 5. The Class 6 Equity Holders shall retain their equity in exchange for a payment of $75,000 to the Debtor within thirty (30) days after the Effective Date. Further, the Class 6 Equity Holders shall resolve any and all obligations owed to the Debtor by transferring their ownership of MacKinnon Holdings, LLC to the Debtor within ten (10) business days after the Effective Date.

### F. Executory Contracts and Unexpired Leases

**(1)** <u>Executory Contracts and Leases Assumed</u>. On the Effective Date, the Debtor assumes the executory contracts and unexpired leases enumerated in Exhibit A to the Plan and shall perform all pre-confirmation and post-confirmation obligations thereunder. Any preconfirmation arrearages shall be credited on the Effective Date unless the parties agree otherwise, or unless the court finds that a proposed payment schedule provides timely cure and adequate assurance of future performance. Post-confirmation obligations will be paid as they come due.

**(2)** <u>Executory Contracts and Leases Rejected</u>. The Debtor is conclusively deemed to have rejected all executory contracts and/or unexpired leases not previously assumed or listed in Exhibit A to the Plan as of the Effective Date, or previously rejected by motion. Claims arising from the rejection of an executory contract or unexpired lease under this section are general unsecured claims in Class 4, except to the extent this court orders otherwise. A proof of claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 30 days after the date of the order confirming the Plan.

### G. Estimation of Claims Participating in the Plan

Under the Bankruptcy Code, a creditor in a Chapter 11 bankruptcy case may participate in an estate if either (1) the creditor has timely filed a proof of claim with the Bankruptcy Court, or (2) the debt owed to the creditor is listed on the debtor's bankruptcy schedules as not being unliquidated, contingent, or disputed. Below is Debtor's best estimation of the amounts of claims in each class. Creditors should be aware, however, that the actual allowed claims in each class may materially differ from Debtor's estimate. Immediately below the estimates is an explanation of some of the factors and contingencies that may render Debtor's estimates

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

inaccurate. Nevertheless, the estimates are provided to give creditors as good an indication as currently possible as to the probable claims.

| Class No. | Description | Estimate | Explanation |
|---|---|---|---|
| | Administrative Expenses | $120,000 to $300,000 | The Debtor hopes the case is open only a few more months, but with billing from debtor's counsel, counsel for the unsecured creditor's committee, the examiner, counsel for the examiner and the Debtor's accountant all accruing, the expense could be high. |
| | Priority Tax Claim | $465.07 | Claims Register – WA Dept. of Revenue |
| 1 | Secured claim of Columbia State Bank | $4,561,044.38 | Bank's counsel, as of 4/4/18: $4,499,833.49, plus expenses of $3,572.76 and any additional expenses due as of the Effective Date, interest accrued and owing through the Effective Date and attorneys' fees and costs of $57,471.62 through March 27, 2018, and all additional reasonable attorneys' fees and costs accrued through the Effective Date, less any payments received by the Class 1 Creditor prior to the date of the confirmation hearing. |
| 2 | Secured claim of Banner Bank | $11,739 | Claims register |
| 3 | Guaranty claim | $0.00 | $2.2 Million loan to MacKinnon Holdings, LLC is fully secured by real property, and Debtor's guaranty should not be needed to repay the obligation. Notwithstanding the foregoing, the Debtor pays the debt service on this obligation by paying rent, and post-confirmation will continue to make the rent payments that pay this obligation. |
| 4 | General unsecured claims | Unknown | Claims will consist of rejection damages, which are unknown at this time. Face value of the contracts the Debtor proposes to reject is $28,482,232. |
| 5. | Equity holders | Will receive no cash payment | Will pay $75,000 obtained from third party to retain equity. |

DEBTOR'S AMENDED DISCLOSURE STATEMENT

Page 4 of 24

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Administrative Expense claims are difficult to estimate due to the uncertainty of future professional fees. Professional fees may vary widely depending on the degree of resistance to the Plan, the extent of claims litigation, and the amount of time the bankruptcy case remains open. The secured claim of Columbia Bank and Banner Bank are straightforward as they are the Debtor's remaining obligations under promissory notes owed to those banks. The Debtor's guaranty claim is based on the guaranty of the promissory note to Columbia State Bank from MacKinnon Holdings, LLC, a company owned by the principals of the Debtor. The General Unsecured Claims is extremely difficult to predict as the class will consist entirely of rejection claims from contracts the Debtor has moved to reject. The contracts are for multiple years and it is unclear how the creditors will calculate their damages. Equity holders will not receive anything other than equity.

Creditors should be aware that Debtor may dispute the amount, priority and/or secured portion of some claims and file objections to those claims. Thus, the claims participating in the Plan may be augmented or reduced through litigation, compromise, or other developments subsequent to the date of this Disclosure Statement and confirmation of the Plan.

### Part 2
### Voting on Confirmation of Plan

**A.**     **Who may vote:** Only impaired creditors are entitled to vote (*see § 1124*). A creditor is entitled to vote on confirmation of the Plan unless (i) the creditor's class is unimpaired (presumed to accept the Plan) or is to receive no distribution (presumed to reject the Plan); (ii) an objection has been filed to that creditor's claim; (iii) that creditor's claim is scheduled by the Debtor as contingent, disputed, unliquidated, or unknown and the creditor has not filed a proof of claim; or (iv) the claim is unclassified (and thus required by law to be paid in full). A creditor whose claim has either been objected to or has been scheduled by Debtor as contingent, disputed, unliquidated, or unknown, or who has not filed a proof of claim, and who wishes to vote, must move to have its claim allowed for voting purposes by filing a motion for such relief in time for that motion to be heard before the hearing on confirmation of the Plan. A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in each capacity by delivering one ballot for the secured part of the claim and another ballot for the unsecured portion of the claim.

**B.**     **How to vote:** This ballot must be mailed to Nathan Riordan, Wenokur Riordan PLLC, 600 Stewart Street, Suite 1300, Seattle, WA 98101. IN ORDER TO BE TABULATED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS BY NOT LATER THAN 5:00 PM PACIFIC, MAY 4 2018. FAILURE TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN IS NEVERTHELESS CONFIRMED.

**C.**     **Effect of vote:** The Plan will be confirmed only if (i) it is accepted by each impaired class, or (ii) it is accepted by at least one impaired class exclusive of insiders (as defined by §101(31)) and the court determines that the Plan is "fair and equitable" (as defined

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 375    Filed 04/04/18    Entered 04/04/18 15:33:44    Pg 8 of 53

by §1129(b)) to all rejecting classes of creditors, and it meets all the other criteria required for confirmation. A class of creditors accepts the Plan if it is accepted by a majority in number and at least two-thirds in dollar amount of the creditors in that class timely voting.

**Part 3**
**Liquidation Analysis**

The Debtor has calculated the liquidation value of each of the Debtor's assets listed on the Debtor's filed Schedules A and B. The Debtor arrived at the net liquidation values that are subject to liens by deducting from the value of the assets the amount of the secured liens and any applicable sales costs, fees, and taxes. The liquidation analysis is attached hereto as **Exhibit B-1** and **B-2**.

Exhibit B-1 shows the assets of the Debtor. The Cash, Accounts Receivable, Inventory, and Hops Canada Judgment are all collateral for the Debtor's $4.5 million obligation to Columbia State Bank. Cash was not discounted. Accounts Receivable was estimated at 50% of its current value if collected by a Chapter 7 trustee. The Debtor estimated that in a Chapter 7, given the current surplus, the Inventory is worth, at best, 50 cents per pound. The Hops Canada judgment appears to the Debtor to be worthless and has an assigned liquidation value of $0.00. These assets do not increase the Debtor's liquidation value to unsecured creditors, as the proceeds all go to Columbia State Bank.

The Brewer Contracts are also collateral for the Columbia State Bank obligation, but only to the extent of diminution in the value of cash collateral. At the time of this writing, it did not appear that any diminution had occurred. Therefore, the Brewer Contracts are unencumbered, for now. The value of the Brewer Contracts is highly subjective. The potential list of bidders for the Brewer Contracts is very small. Only about 2 or 3 businesses in the world can realistically service those contracts. The Debtor spoke to one of them, who balked at purchasing the contracts because in a bankruptcy setting the terms would be public, thus undermining the value of the contracts, as any known discount will encourage the brewers to claim excused performance. The Debtor chose ten percent of the scheduled value, which itself was a subjective estimate, as the liquidation value of the Brewer Contracts. It is unlikely a Chapter 7 trustee could obtain more than $200,000 for those contracts, all of which would go to unsecured creditors.

The hard equipment: Office Furniture, Indoor Steel Lightbox, Security Camera, Computers, TV Monitor & Receiver, Sonic Beam Speakers, Cat Walk, Forklift, Pellet Line, Air Compressor, Pellet Mill, Hop Bale Weight Machine, and Bar Code Machine were all valued at ten percent of current value.

The 2007 Freightliner has a residual value of $6,599 after sale at Kelly Blue Book value and payment of lien.

The Warehouse Lease and Office Lease have no value. The Debtor is uncertain if it has a claim against its prior accounting firm for the condition of its financial records, whether an

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

attorney would take up such a claim, and whether there is any value to it. Accordingly, the Debtor estimates that any such claim has no value.

Any and all distributions as a result of a sale are subject to a Chapter 7 trustee fee, which is reflected, as well as an estimated ten percent for costs of sale.

A problematic asset of the Debtor is the receivable owed to the Debtor by the Debtor's principal, Doug MacKinnon. The Debtor's accountant discerned that a great deal of the receivable is simply transfers to parties to pay them for services rendered or materials provided to MacKinnon Holdings, LLC. This matters in that it is determinable that Doug MacKinnon is not holding millions of dollars in cash, and that any estimate of the amount the Debtor could collect on this receivable must be based on a liquidation of the assets of Doug and Anastasia MacKinnon.

The Debtor estimates that the total amount to be gained from suing the MacKinnons and forcing them to file a Chapter 7 is $411,857. Exhibit B-2 shows the analysis. All of the MacKinnons' property is either exempt or encumbered except for two cars and a condominium in California. The value of the cars is shown at Kelly Blue Book values. The Debtor searched online for comparable sales and estimates of the value of the condo. The condo is smaller than another currently on the market and would ostensibly fetch less in a distress sale with no touch-up or staging.

Therefore, the Debtor believes the liquidation value of the Debtor is $520,563.

The Unsecured Creditors Committee requested the Debtor provide appraisals for all real estate, equipment and vehicles referenced in this Disclosure Statement. Other than vehicle valuations obtained online, the Debtor is unable to comply with the request to provide appraisals, as the Debtor does not possess them, is unwilling to pay for appraisals, and could not obtain appraisals in time for consideration of this Disclosure Statement.

Another concern raised by the Unsecured Creditors Committee are certain pre-petition transfers to the MacKinnons totaling $470,000. These transfers were made by the Debtor to Doug MacKinnon during the 14 months prior to the filing and were not salary payments. The Debtor submits that $385,000 of the funds were used to fund an entity called MacKinnon Industries, LLC, which entity was developing a piece of machinery. The investment and development have ceased. The remainder was used to pay for items related to the warehouse owned by MacKinnon Holdings, LLC.

The MacKinnons' Yakima residence consists of 3,969 sq. ft of finished buildings, aan 11-acre parcel and 2,100 sq. ft. shop. Using recent sold homes and a nearby listed home, the value per finished square foot is estimated to be $155.42/sq. ft. The value per acre is estimated at $10,000, and the value of the shop is estimated at $75,000. The total value is therefore estimated to be $762,861.The real estate is fully encumbered by the Debtor's $4.5 Million obligation to Columbia State Bank.

DEBTOR'S AMENDED DISCLOSURE STATEMENT

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11   Doc 375   Filed 04/04/18   Entered 04/04/18 15:33:44   Pg 10 of 53

In the Disclosure Statement, the Debtor estimated the liquidation value of 2014, 2015, and 2016 hops at $.25 per pound for all varieties except for the CTZ variety, which is currently short. For the CTZ variety, the value is estimated to be $2.50 per pound

The Debtor delivered redacted bank balance statements from Doug and Anastasia MacKinnon to counsel for the Unsecured Creditors' Committee, which are consistent with Exhibit B-2. However, the Debtor has not provided account statements for the MacKinnons' bank accounts.

Since 2014 the Debtor has had in place an Interest Charge Domestic International Sales Corporation (IC-DISC) known as Schmingledorf Inc. The purpose of the IC-DISC is essentially to collect commissions from the associated company based on a percentage of foreign sales and either accumulate those funds and pay an interest charge, or remit those funds to its owners in the form of a dividend. After the tax rate on qualified dividends lowered in 2002 these DISC entities became popular as a way to pay a commission that is deducted at ordinary corporate or individual tax rates and pick it up as qualified dividend income taxed at the lower 15-20% qualified dividend rate. The net effect is a reduced tax liability on the profits from foreign sales. The Debtor intends to continue this practice.

## Part 4
## Best Interests of the Creditors

If any holder of a claim or interest does not accept the Plan, the Court must determine that each holder of a claim will receive or retain under the Plan, on account of that holder's claim, property having a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code on such date. This is the "best interests of creditors" standard. As discussed in Part 3 of this Disclosure Statement, in the event of liquidation, unsecured creditors would not realize more and would realize substantially less than they will receive under the Plan. The Debtor believes the Plan satisfies this test.

## Part 5
## History

Bankruptcy Case: The Debtor filed its voluntary Chapter 11 petition on August 11, 2017 (the "Petition Date"). The Bankruptcy Court authorized the Debtor's employment of its bankruptcy attorney, Wenokur Riordan PLLC, on August 31, 2017. The court approved the Debtor's employment of Alegria & Company, PS as its accountant on September 22, 2017. On November 27, 2017, the court granted Wenokur Riordan PLLC its first award of interim attorney's fees and costs in the amount of $62,687.72.

On August 16, 2017, the court authorized the Debtor's interim use of cash collateral, with the exception of purchasing hops on the spot market, granted a Replacement Lien to Columbia Bank, and required the provision of monthly financial reports to Columbia Bank.

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

On August 18, 2017, the court denied interim use of cash collateral for the purpose of purchasing hops prior to final hearing on use of cash collateral.

On August 24, 2017, the court authorized the Debtor to provide adequate assurance to Debtor's utility providers in the form of a cash deposit.

On September 6, 2017, the court authorized a 2004 examination of the Debtor by creditor Wyckoff Farms, Inc. ("Wyckoff"), which was held on October 19, 2017.

On September 7, 2017, the United States Trustee appointed the following creditors to the Debtor's Official Unsecured Creditors Committee (the "UCC"): Roy Farms, Inc.; Wyckoff Farms, Inc.; and Green Acre Farms, Inc. The court approved the employment of Cairncross & Hempelmann, P.S. as attorney for the UCC on October 6, 2017. On October 19, 2017, the United States Trustee amended the appointed creditors of the UCC to include the following creditors: Roy Farms, Inc.; Wyckoff Farms, Inc.; Green Acre Farms, Inc.; DER Hops LLC, and Stone Brewing Co. LLC.

On September 22, 2017, the court authorized the Debtor's second interim use of cash collateral, including payment of salaries to Douglas MacKinnon and Anastasia MacKinnon, a Replacement Lien and Additional Lien to Columbia Bank, the required provision of monthly financial reports to Columbia Bank, the UCC, and the U.S. Trustee, and set December 5, 2017, as the hearing date for final use of cash collateral.

Court continued the final hearing on cash collateral to October 3, 2017, and then continued it again to December 5, 2017.

The Debtor defaulted on financial reporting requirements to the US Trustee's office and under the cash collateral order. In order to assure all parties of the integrity of the Debtor's records on inventory and financials, the Debtor consented to the appointment of an examiner in the case. The court approved the appointment of Marcia Frey as Chapter 11 Examiner (the "Examiner") on October 4, 2017. The court approved the employment of Hillis Clark Martin & Peterson P.S. as attorney for the Examiner on January 10, 2018.

In November 2017, the U.S. Trustee filed a motion to dismiss or convert the Debtor's case because the Debtor had been redacting the names of contracted breweries from the Debtor's filed monthly operating reports. The Debtor filed an objection to the U.S. Trustee's motion and filed a motion seeking authorization for the redactions, to which the U.S. Trustee objected. The Debtor agreed to and filed unredacted monthly operating reports, and the U.S. Trustee and the Debtor withdrew their respective motions.

On December 7, 2017, the court entered an Agreed Order Approving Final Use of Cash Collateral and Granting Replacement Liens, which authorized, among other things, a monthly adequate protection payment to the Bank in the amount of $18,750.00 per month, required monthly financial reporting to the Bank, the UCC, and the U.S. Trustee, and the purchase of hops on the spot market. The UCC negotiated the terms under which the Debtor can purchase

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

spot hops, such that the growers already under contract with the Debtor as of the Petition Date have the right of first refusal to fulfill the purchase of that particular hop variety.

Additionally, on December 7, 2017, the court granted the Debtor's motion for extension of the time to assume or reject leases of its non-residential real property to March 8, 2018 (describe leases?), and also entered an Agreed Order Extending Exclusivity Periods Pursuant to 11 U.S.C. §1121(D)(1) and Setting Deadlines, in which deadlines with respect to the filing and confirmation of the Debtor's Disclosure Statement and Plan of Reorganization were set, among other deadlines.

On January 9, 2018, the Debtor filed an application for the first interim fees for its accountant, Alegria & Company, PS, in the amount of $72,563.80 for post-petition work performed through December 31, 2017.

On January 10, 2018, the court granted Cairncross & Hempelmann, P.S., attorney for the UCC, its first award of interim attorney's fees and costs in the amount of $73,779.85.

Historical Background and Market Context:

The Debtor is a merchant/wholesaler of hops and hop products whose business and operations are all located in Yakima, Washington. The Debtor derives its revenue from the processing, sale, storage, and delivery of hops and hop products. The Debtor purchases hops and hop products primarily from growers, processes the hops into pellet form, and then sells the baled hops to beer brewers in the U.S. and abroad.

The husband and wife team of Douglas and Anastasia MacKinnon (the "MacKinnons") formed the 47 Hops LLC in January of 2013. The MacKinnons own 100% of the Debtor, which primarily purchases hops and hop products from growers, processes the hops into pellet form, and then sells the processed hops to beer brewers in the U.S. and abroad.

The MacKinnons also own 100% of MacKinnon Holdings LLC, the entity that owns the Yakima facility rented by the Debtor. The development of the Yakima facility commenced in 2014, was subsidized by the Debtor and was completed with a loan to MacKinnon Holdings LLC in September of 2016, which loan paid back the Debtor for a portion of the proceeds used to build the facility. The transaction is discussed more fully below in Part 12.

On the Petition Date, the Debtor had contracts with 12 entities to purchase their hops and hop products. These grower contracts typically span three to five years of hops planting, harvesting, and delivery to the Debtor's processing and storage facility in Yakima, Washington. The Debtor then processes the hops into pellet form, packages them in air-tight mylar foils and stores them at temperatures at or below freezing. The Debtor then sells the hops to brewers/breweries on both a contract and spot-market sales basis. The Debtor has 150+ contracts with brewers/breweries, and typically the brewery contracts also span a period of three years for storage at and delivery from the Yakima facility.

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

The growth in the hops industry was fueled by the popularity of the craft beer industry, which enjoyed annual double-digit growth for several years. Growth in the craft beer industry peaked at 18% in February 2014. Since then, growth in the craft beer market has decreased to its current level of approximately 6% year on year in 2016, according to a Brewers Association press release on March 28, 2017.

Optimism surrounding the double-digit growth of the craft beer industry continued much longer than the actual growth itself. Farmers continue to this day to plant additional acreage with the reasoning that all their hops are contracted, despite information that brewers are not paying in a timely manner on the contracts. Copious articles and statistics published by the Brewers Association and others proclaiming the craft beer industry was on track to reach 20% of domestic U.S. beer production by 2020 dominated the industry news, fueled the frenzy, and further supported the belief that additional hops acreage was necessary.

The Committee believes the Debtor's view of the craft brew industry may not be totally accurate. See the excerpt from Craft Brew News:

*From Craft Brew News, Volume 9, No. 19, February 22, 2018*

**Early Estimate: Craft Volume +5% to Around 25 Mil Bbls, BA Sez; Hop Concerns Overblown?**

Nothing finalized yet, but looks like total Brewers Assn-defined US craft volume grew around 5% last yr to about 25 mil bbls, perhaps as much as 25.3 mil bbls, org's supply chain specialist Chris Swersey shared during hops-focused Power Hour presentation today. Note that tracks our estimate (published with top craft brewer stats on Jan 26) pretty closely, regardless of slight puts and takes. Mid-single-digit growth is "a little slower than the year before," Chris acknowledged. But "craft volume did grow and that's very important for hop growers and hop dealers to get their arms around."

Importance of even modest craft brewer growth particularly important to the hop industry because it's compounded by continued increases in average hop usage per bbl, Chris noted. Average usage grew 2.7% from 1.5 lbs per bbl to 1.54 lbs per bbl, according to 2017 hop usage survey conducted by BA among members, asking about the 2016 brewing yr. Combine growth of craft volume and hop usage and "turns out that's almost half a million pounds of hops," Chris pointed out, which "matters a great deal" to hop growers and dealers. Also gotta note that usage rate jumped "way over 50%" since 2007, when it was less than a lb per bbl. Up over 10% since just 2014, "driven by the growth of IPA."

Tons more detail offered by Chris about US hops market in addition to recently published Stat Pack from Hop Growers of America (coming in future issues). But recent headlines from consumer-facing and other publications highlighted a "saturation point" in US hop market. "All key indicators suggest current aroma hop demand has largely been satisfied by the unprecedented expansion of US acreage in recent years," release from HGA states. The 2017 US hop crop topped 104 mil lbs just out of PacNW, biggest crop ever, following massive increase in acreage over last few yrs, as we've written.

Stories also claim that slowdown in craft growth meant that small brewers couldn't pay for hops they'd already contracted for. That's certainly happened in some cases, but concerns may be somewhat overblown, according to Chris' presentation today and comments from HGA's Jaki Brophy. Some hop dealers and merchants are having "more frank

DEBTOR'S AMENDED DISCLOSURE STATEMENT

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

conversations with their brewery customers," she told Craft Brew News, but in general are "working hard" to find equitable solutions for everybody while getting to a "more predictable and steady" hop supply. The "majority of relationships" are "good" right now, she said. Some dealers "are reworking contracts with a very small number" of brewery customers, as Chris summarized comments from those dealers during a panel at the annual Hop Growers Convention earlier this yr. But in general, they didn't express much concern about holding a larger and larger portion of hop inventory for longer. That's mostly a function of the increase in small brewers, which tend not to hold onto their own hop inventory and choose to pay dealers to keep it for them, whereas larger brewers often store it themselves, Chris explained. And about that "saturation point," and concerns about any oversupply of hops, Jaki reiterated that this is "not the first time this has happened" for the hop industry, which is "pretty cyclical."

The overly optimistic atmosphere in the hop industry continued unchallenged through 2015 and into the beginning of 2016. Brewers enjoyed annual double-digit growth of their most popular brands for several years. Variety shortages gave the impression of overall shortages to many brewers who, with a false sense of confidence, were comfortable signing long-term contracts for hops at high prices. Growers continued to plant for those contracts. In 2016, when the slow-down in the craft beer market became obvious, many brewers began asking for contract renegotiations. Slowing growth happened first among the largest craft brewers where competition was fierce. In the early stages of the slow-down, growth by small- and medium-sized brewers absorbed reductions from the larger brewers' contracts. Merchants absorbed this round of renegotiations by shuffling inventory from the haves to the have-nots.

The hop industry, eager to take advantage of a growth opportunity, borrowed hundreds of millions of dollars from banks based on forward contracts with merchants and farmers. Brewers borrowed heavily to expand their production capacity as well. By 2016, the majority of the brewing and hop-related industries were heavily leveraged. This is significant, because it meant cash flow was tight everywhere.

The heavy influx of bank money created a vicious cycle. To fund investments in infrastructure, farmers required stability in the form of long-term contracts. Brewers signed long-term contracts of 3-5 years to beat the ever-increasing prices of merchants and farmers. Costs of production increased across the industry due to the influx of bank-controlled money, but sales prices in the hop industry are not tied to costs. They soared even higher than the debt and justified creating what can only be described as "irrational exuberance." The bubble continued to grow.

By the end of 2016, brewers and merchants could not match their hop contract volumes to the newly reduced level of demand on the craft beer market. The result was oversupply building up in warehouses across Yakima, as evidenced by the USDA stocks report of March 2017. It became nearly impossible to shuffle inventory between brewers who had surplus hops and those who needed them-- the volume of surplus hops was simply too large. Burdened with debt and clinging to the belief that a contracted position was as good as money in the bank, many farmers and some merchants refused to renegotiate brewer contracts when opportunities arose. In some isolated cases the Debtor was guilty of this, although if reasonable renegotiation of a contract was possible in 2016, the Debtor pursued that route. Realizing the seriousness and

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

scale of the situation, the Debtor became much more flexible with respect to time and renegotiations. Brewers who were unable or unwilling to renegotiate their contracts began to delay deliveries and their corresponding payments, thereby creating a stockpile of contracted hops in merchant inventory, including in the stores of 47 Hops.

In January 2017, it was clear that the current situation with slowed brewer payments and on-time grower payments would not be sustainable without an ever-increasing line of credit. The Debtor began a series of talks to explore the possibility of renegotiating contracted positions and lowering the volumes considerably. At that time, the Debtor was open to the idea of reducing volumes and extending the number of years of the contracts in place, a practice common in the industry. The Debtor was unable to efficiently renegotiate its contracts.

As planting commenced in the spring of 2017, it was clear that the majority of farmers were still of the opinion that the market was growing. American farmers planted an additional 4,500 acres. However, at the same time, one of the Debtor's largest brewery customers delayed payment of nearly $2 million. As a result, 47 Hops was unable to make the timely March/April payment to several growers. Instead, the Debtor offered a payment plan solution that included three equal monthly payments on the 15th of April, May, and June 2017. One of the Debtor's suppliers immediately threatened to file a processor lien if 47 Hops did not make full payment within 20 days of the original due date. On the final day of that deadline, the Debtor and that grower signed an amendment to the agreement effectively giving the Debtor 30 more days to pay the entire amount in full. Some other suppliers accepted the Debtor's proffered payment plan, and 47 Hops made all those payments per the revised plans. However, without the cooperation of all suppliers the gap between the Debtor's inventory supply and customer payments continued to widen.

At the end of 2016 and the beginning of 2017, large brewers began to aggressively try to sell off their excess inventory. As a result, low spot-market prices between brewers and merchants, and also between brewers, were commonplace. It was obvious that, under current market conditions, a buy-out payment at anything near 50% of contract face value would be impossible. It was also obvious that with the market quickly moving into a heavily oversupplied surplus condition due to continued planting by farmers, the situation would become more extreme as time progressed. The momentum and enthusiasm among farmers to continue planting contracted hops will ensure that prices on the spot hop market will continue to be significantly lower than contracted price.

On December 27, 2017, the Debtor filed motions to reject all of the Debtor's grower contracts in order to free itself from the obligation to purchase hops at above-market prices. The Debtor will then purchase hops on the spot market at market prices from brewers and farmers willing to sell to it, with the originally contracted growers having the right of first refusal. Once free to float in the market and source hops at current market prices, the Debtor can then sell hops to brewers at competitive prices. Currently, the Debtor's contracts with brewers suffer from two problems. First, many of the contracts are priced above today's market, thereby incentivizing brewers to breach their contracts. The Debtor has found suing for breach and attempting to collect on judgments to be very expensive, frustrating, and an overall bad

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 375    Filed 04/04/18    Entered 04/04/18 15:33:44    Pg 16 of 53

business practice. Second, because demand has softened, many of the brewers have surplus hops and do not need the amounts for which they originally contracted with the Debtor. Therefore, rejecting the grower contracts will allow the Debtor to aid its customers by realigning their contracted volumes with their actual needs at competitive market prices. The Debtor's contacts within the hops market will enable the Debtor to find hops to purchase despite the Debtor's rejection of the grower contracts. The surplus of hops everywhere in the market means that many parties will be eager to sell hops even at sharply reduced prices, rather than lose the hops to spoilage.

The spot market for hops is traditionally much more volatile than the contract market because it reacts to actual demands for hops by variety in a real-time basis year by year, whereas the contract market moves much more slowly over time with waves moving from largely contracted markets to largely uncontracted markets over the course of a decade.

In the spring of 2018 the aroma market is severely oversupplied. This can be evidenced by the build-up of inventories in the March 2018 USDA stocks report and the reduced rate of depletion between the reports. That means stocks of hops, which are all contracted and technically "sold" are piling up in warehouses. The Debtor estimates the current surplus at 40-50 million pounds.

The result of all this oversupply is that for the better part of the next decade prices on the spot market will be below the cost of production. Brewers who have contracted inventory they do not need, but are forced to purchase are currently looking to liquidate that inventory. They will continue to do so. Furthermore, they are already getting more aggressive with their liquidation efforts, quietly unleashing a flood of cheap hops onto the hop market. This will keep prices further depressed for years to come. That is unprecedented in the hop industry so the effects cannot be predicted.

The Debtor maintains a competitive advantage due to the Debtor's knowledge of both the domestic and international hops markets on both the buy and sell side, including a broad familiarity with varieties of hops specific to different regions all over the globe. The MacKinnons' combined knowledge of and experience in the hops industry is vast. Doug MacKinnon is president of the Debtor and has worked in the hops industry since 1999. Doug has served as Director of Hop Growers of America and as Chairman of the Economic Committee of the International Hop Growers Convention, and he has written and maintained a blog on the hops and hops-related industries on the Debtor's website for many years. Anastasia MacKinnon is Vice President of Sales and International Business Development and has been involved in the hops industry for over a decade, and she transacts domestic and international business for the Debtor in four languages. The MacKinnons will remain in their respective salaried management roles with the Debtor.

The Debtor is confident that, once freed from unprofitable contracts, it can take advantage of the Debtor's knowledge of the needs and preferences of the players in the hop industry worldwide to continue to make profitable sales of hops in sufficient quantities to be a viable ongoing business.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Past Performance:

Debtor had sales for the past four years as follows:

| Year | Gross Revenue |
|------|---------------|
| 2014 | $4,984,872 |
| 2015 | $7,134,762 |
| 2016 | $10,647,477 |
| 2017 | $7,563,350.66 |

The Committee's investigation has disclosed that the Debtor's historical financial information has proven inherently inaccurate and unreliable, therefore it cannot verify the accuracy of historical data.

Current financial condition:

The monthly profit or loss since the Petition Date is as follows:

| Month ending | Net Income |
|--------------|------------|
| August 31, 2017 | $384,741.09 |
| September 30, 2017 | $644,203.34 |
| October 31, 2017 | ($104,703.59) |
| November 30, 2017 | $43,067.59 |

**Part 7**
**Feasibility**

The Debtor must establish that confirmation of the Plan is not likely to be followed by the need for further financial reorganization. Barring any major unforeseen economic events, the Debtor is confident the Plan is feasible and that the Bankruptcy Court will agree. A Bankruptcy Court finding of feasibility does not guarantee that the Debtor will successfully complete or pay all of its obligations under the Plan.

Attached as **Exhibit C** are Debtor's projections for its business operations through December 2022. Debtor developed the projections internally based on a combination of historical performance and on the contracted volumes contained in the contracts the Debtor will

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

assume as part of the Plan, using very conservative numbers given the volatility of the current business climate. The revenue projections were created by using 2018 as the base year for projections, and identifying the contracts the Debtor believed are likely to be performed and those that are likely to be adjusted or breached. The Debtor then assumed that in addition the contracted volumes, the Debtor would do an additional 20% of revenue in spot hops sales. The Debtor's projections assume a decline in sale price and cost of hops going forward, but with a base level of demand from customers interested in continuing to buy some amount of hops out of necessity and out of contractual obligation. The Plan provides for Debtor's business operations to generate sufficient profits to fund payments to creditors. Debtor believes that its projections are reasonable and can be achieved. As such, Debtor believes the Plan is feasible as defined by Bankruptcy Code requirements.

In response to a request from the Unsecured Creditors' Committee, the Debtor wishes to point out that over the course of the Plan, expenses of the Debtor are projected to decline. This is for primarily two reasons: the Debtor's legal expenses will decline, and the Debtor anticipates the price of hops to decline.

Historically spot sales of hops have comprised about 5% of the Debtor's revenue. Going forward the Debtor believes this amount will increase to 20% due to the volatile nature of the hops market. and the reduction of contract opportunities going forward. While admittedly many brewers and growers will attempt to sell surplus hops directly, the Debtor and other merchants will remain a destination for brewers seeking to satisfy specific demand.

The tax estimates found in the Debtor's projections are the federal tax consequences of operations to the owners of the Debtor, which is a pass-through entity for tax purposes. The amounts were determined by the Debtor's accounting firm at the request of the Debtor.

The travel expenses of the Debtor were determined by using 2018 as a base year and assuming similar travel for the remaining years of the Plan. The Debtor's projected travel expenses for 2018 include airfare, transportation, hotel accommodations, food, and in some cases fees for the following events:

March – visit customers in Argentina, Peru, Mexico and Brazil.
March - Speaking at a craft trade show in Brazil.
May - CBC in Nashville Tennessee for one week, host 3-4 dinners for customers/brewers during conventions
May - International Hop Growers Convention meeting in Paris for 3 days
July - International Hop Growers Convention meeting for 5 days
September - Great American Beer Festival in Denver Colorado for 5 days, host 1-2 dinners/lunches for customers/brewers
September - Travel budget also includes brewer/customer entertainment in Yakima for those who visit Debtor's facility.
October – visit customers in Mexico, Argentina, Brazil, speak at a craft trade show in Mexico. Conduct seminars for craft brewers in Argentina and Brazil, trip will last 2 weeks

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

November - International Hop Growers Convention in Nurnberg for 2 days
November - Brau trade show Nurnberg for 4 days, host 4 dinners with customers/brewers

The Debtor is unable to produce reliable financial statements for the time periods prior to the Petition Date due to poor accounting and inventory control, making assessment of the Debtor's prior performance impossible. The Debtor believes this is not highly relevant as the Debtor's future operations will be responding to a completely different market reality from the pre-petition market.

The Debtor does not have a pro forma balance sheet for the period effective 12/31/22. The best estimate of the value of the entity after successfully running the business under the proposed plan for 5 years is the value of the inventory, cash on hand, and the equity in the warehouse complex at the time, which will redound to the benefit of the Debtor due to the Debtor's ownership of MacKinnon Holdings, LLC. Under the Plan, the warehouse complex becomes a wholly owned subsidiary of the Debtor. The Debtor's best estimate of the warehouse complex is $3,400,000 and is based on the reported value of a bank appraisal of the property not made available to the Debtor. There are deferred repairs needed to the complex that may cost between $200,000 to $500,000 not factored into that appraisal number. The equity in the real estate is therefore estimated to be less than $1,000,000 at the end of the Plan barring any other significant unforeseen occurrences. At the end of the Plan, The Debtor estimates that the Debtor will have a cash balance of less than $100,000 and an inventory value of approximately $250,000. Therefore, the Debtor will be worth approximately $1,350,000 at the end of the Plan.

The Debtor estimates the following professional fees for 2018:

Debtor's Counsel

    Amount billed to date: $136,800.50

    Amount estimated for remainder of 2018: $40,000 to $120,000

Counsel for the Unsecured Creditors' Committee

    Amount billed to date: $72,666.50

    Amount estimated for remainder of 2018:

The Debtor's accounting firm:

    Amount billed to date: $71,291.40

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Amount estimated for remainder of 2018: $40,000 to $60,000 in addition to fees already billed.

The Examiner

Amount billed to date: $20,280

Amount estimated for remainder of 2018:

Counsel for the Examiner

Amount billed to date: $12,387.50

Amount estimated for remainder of 2018:

An affiliate of the Debtor with common ownership, BioRev LLC, will sell approximately 40,000 pounds of Citra hops to the Debtor in 2018 and will be the only active hops purchaser or seller owned or controlled by Doug and Anastasia MacKinnon, including themselves, other than the Debtor. The only activity BioRev LLC will conduct will be to purchase hops and sell them to the Debtor at a very slight markup to cover administrative costs.

Another affiliate of the Debtor with common ownership, SIA Spectre, is anticipated to sell the following hops to the Debtor in 2018:

| VARIETY | LBS CONT | CROP YEAR |
|---|---|---|
| MANDARINA BAVARIA (GR) | 264 | 2017 |
| SAAZ (CZ) | 330 | 2017 |
| EKG (UK) | 352 | 2017 |
| MANDARINA BAVARIA (GR) | 110 | 2017 |
| NORTHERN BREWER (GR) | 33 | 2017 |
| SAAZ (CZ) | 11 | 2017 |
| STRYIAN GOLDING CELEIA | 22 | 2017 |
| BRAMLING CROSS (UK) | 44 | 2017 |
| EKG (UK) | 22 | 2017 |
| FUGGLE (UK) | 44 | 2017 |
| HALLERTAU BLANC (GR) | 11 | 2017 |

| VARIETY | LBS CONT | CROP YEAR |
|---|---|---|
| SAAZ (CZ) | 220 | 2017 |
| STRYIAN GOLDING CELEIA | 627 | 2017 |
| HALLERTAU BLANC (GR) | 44 | 2017 |
| HALLERTAU MITTLEFRUH (GR) | 264 | 2017 |
| HULL MELON (GR) | 44 | 2017 |
| MANDARINA BAVARIA (GR) | 44 | 2017 |
| SAAZ SPECIAL (CZ) | 2,002 | 2017 |
| MANDARINA BAVARIA (GR) | 88 | 2017 |
| EKG (UK) | 22 | 2017 |
| EKG (UK) | 22 | 2017 |
| FUGGLE (UK) | 22 | 2017 |

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

| | | | | | |
|---|---|---|---|---|---|
| HALLERTAU MITTLEFRUH (GR) | 11 | 2017 | FUGGLE (UK) | 22 | 2017 |
| HULL MELON (GR) | 44 | 2017 | HALLERTAU MITTLEFRUH (GR) | 22 | 2017 |
| MAGNUM (GR) | 77 | 2017 | HALLERTAU MITTLEFRUH (GR) | 22 | 2017 |
| MANDARINA BAVARIA (GR) | 44 | 2017 | SAAZ (CZ) | 22 | 2017 |
| SAAZ (CZ) | 55 | 2017 | SAAZ (CZ) | 22 | 2017 |
| SAAZ (CZ) | 55 | 2017 | HALLERTAU BLANC (GR) | 11 | 2017 |
| STRYIAN GOLDING CELEIA | 33 | 2017 | NORTHERN BREWER (GR) | 22 | 2017 |
| Saphir (GR) | 44 | 2017 | HALLERTAU MITTLEFRUH (GR) | 528 | 2017 |
| EKG (UK) | 88 | 2017 | HALLERTAU MITTLEFRUH (GR) | 110 | 2017 |
| EKG (UK) | 176 | 2017 | HALLERTAU BLANC (GR) | 704 | 2017 |
| SAAZ SPECIAL (CZ) | 88 | 2017 | HULL MELON (GR) | 440 | 2017 |
| EKG (UK) | 44 | 2017 | MANDARINA BAVARIA (GR) | 352 | 2017 |
| HALLERTAU BLANC (GR) | 132 | 2017 | HALLERTAU BLANC (GR) | 88 | 2017 |
| HALLERTAU MITTLEFRUH (GR) | 132 | 2017 | HULL MELON (GR) | 88 | 2017 |
| MAGNUM (GR) | 22 | 2017 | HALLERTAU MITTLEFRUH (GR) | 440 | 2017 |
| MAGNUM (GR) | 44 | 2017 | ARIANA | 440 | 2017 |
| SAAZ (CZ) | 55 | 2017 | AURORA (SLO) | 440 | 2017 |
| FUGGLE (UK) | 1,100 | 2017 | CALLISTA | 440 | 2017 |
| HALLERTAU BLANC (GR) | 660 | 2017 | HALLERTAU BLANC (GR) | 880 | 2017 |
| HALLERTAU MITTLEFRUH (GR) | 1,100 | 2017 | HALLERTAU MITTLEFRUH (GR) | 440 | 2017 |
| EKG (UK) | 55 | 2017 | HULL MELON (GR) | 880 | 2017 |
| FUGGLE (UK) | 44 | 2017 | MANDARINA BAVARIA (GR) | 440 | 2017 |
| EKG (UK) | 44 | 2017 | SAAZ (CZ) | 440 | 2017 |
| HALLERTAU BLANC (GR) | 44 | 2017 | HULL MELON (GR) | 143 | 2017 |
| HALLERTAU MITTLEFRUH (GR) | 44 | 2017 | HALLERTAU BLANC (GR) | 121 | 2017 |
| HULL MELON (GR) | 44 | 2017 | HULL MELON (GR) | 121 | 2017 |
| MANDARINA BAVARIA (GR) | 44 | 2017 | HULL MELON (GR) | 22 | 2017 |
| SAAZ (CZ) | 44 | 2017 | SAAZ (CZ) | 352 | 2017 |
| EKG (UK) | 440 | 2017 | EKG (UK) | 88 | 2017 |
| MAGNUM (GR) | 440 | 2017 | MAGNUM (GR) | 264 | 2017 |
| MANDARINA BAVARIA (GR) | 660 | 2017 | MANDARINA BAVARIA (GR) | 88 | 2017 |

DEBTOR'S AMENDED DISCLOSURE STATEMENT

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

| Variety | Amount | Year | Variety | Amount | Year |
|---|---|---|---|---|---|
| HULL MELON (GR) | 528 | 2017 | SAAZ (CZ) | 132 | 2017 |
| AURORA (SLO) | 44 | 2017 | STRYIAN GOLDING CELEIA | 88 | 2017 |
| FUGGLE (UK) | 132 | 2017 | SAAZ (CZ) | 880 | 2017 |
| FUGGLE (UK) | 176 | 2017 | ARIANA | 440 | 2017 |
| SAAZ (CZ) | 88 | 2017 | HALLERTAU BLANC (GR) | 660 | 2017 |
| SAAZ SPECIAL (CZ) | 88 | 2017 | EKG (UK) | 44 | 2017 |
| SAAZ SPECIAL (CZ) | 132 | 2017 | FUGGLE (UK) | 44 | 2017 |
| STRYIAN GOLDING CELEIA | 44 | 2017 | SAAZ (CZ) | 44 | 2017 |
| FUGGLE (UK) | 231 | 2017 | STRYIAN GOLDING CELEIA | 44 | 2017 |
| HALLERTAU BLANC (GR) | 110 | 2017 | MANDARINA BAVARIA (GR) | 176 | 2017 |
| MAGNUM (GR) | 110 | 2017 | MANDARINA BAVARIA (GR) | 506 | 2017 |
| SAAZ SPECIAL (CZ) | 77 | 2017 | MANDARINA BAVARIA (GR) | 11,000 | 2017 |
| STRYIAN GOLDING CELEIA | 77 | 2017 | HERKULES (GR) | 264 | 2017 |
| AURORA (SLO) | 22 | 2017 | MAGNUM (GR) | 33 | 2017 |
| EKG (UK) | 44 | 2017 | NORTHERN BREWER (GR) | 33 | 2017 |
| EKG (UK) | 165 | 2017 | PERLE (GR) | 33 | 2017 |
| EKG (UK) | 396 | 2017 | HALLERTAU BLANC (GR) | 44 | 2017 |
| EKG (UK) | 440 | 2017 | HULL MELON (GR) | 44 | 2017 |
| FUGGLE (UK) | 176 | 2017 | EKG (UK) | 484 | 2017 |
| HALLERTAU MITTLEFRUH (GR) | 132 | 2017 | SAAZ (CZ) | 1,408 | 2017 |
| HERKULES (GR) | 44 | 2017 | MANDARINA BAVARIA (GR) | 176 | 2017 |
| HULL MELON (GR) | 44 | 2017 | PERLE (GR) | 176 | 2017 |
| MAGNUM (GR) | 88 | 2017 | SAAZ (CZ) | 176 | 2017 |
| MANDARINA BAVARIA (GR) | 44 | 2017 | FUGGLE (UK) | 176 | 2017 |
| NORTHERN BREWER (GR) | 220 | 2017 | HALLERTAU MITTLEFRUH (GR) | 176 | 2017 |
| PERLE (GR) | 88 | 2017 | NORTHERN BREWER (GR) | 176 | 2017 |
| PERLE (GR) | 99 | 2017 | PERLE (GR) | 88 | 2017 |
| SAAZ (CZ) | 44 | 2017 | SAAZ (CZ) | 1,100 | 2017 |
| SAAZ (CZ) | 44 | 2017 | STRYIAN GOLDING CELEIA | 1,232 | 2017 |
| SAAZ (CZ) | 132 | 2017 | SAAZ SPECIAL (CZ) | 407 | 2017 |
| SAAZ (CZ) | 176 | 2017 | EKG (UK) | 132 | 2017 |
| | | | **Total** | **43692** | |

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

An estimate of the Debtor's value at the end of the Plan is provided as **Exhibit B-3**.

**Part 8**
**Risks**

The successful implementation of the Plan is contingent upon many assumptions, some or all of which could fail to meet expectations and preclude the Plan from being confirmed or producing the anticipated results. Some of the more significant risks are as follows:

1.     There is no guarantee that Debtor will be able to operate its business at the profit levels set forth in its projections.

2.     The hop and craft beer industry business has seen demand flatten, and it may continue to flatten or even decline.

3.     The Debtor could be unable to purchase hops on the spot market due to Debtor's bankruptcy, putting the Debtor at a competitive disadvantage and unable to profitably perform.

4.     The amount of hop surplus could continue to increase, making the market so unpredictable that even with the Debtor's experience and market position, the profitable purchase and sale of hops becomes challenging and the Debtor is unable to meet its projections.

5.     Debtor has not done any investigation as to the tax consequences for creditors under the Plan. There may be adverse tax consequences for creditors, and creditors with such concerns should consult their own tax advisors.

6.     There is uncertainty as to the amount of claims against Debtor that will be allowed in each class.

7.     The Plan is subject to approval by the various classes of creditors entitled to vote under the Bankruptcy Code and to confirmation by the Bankruptcy Court. No assurance can be given that the Plan will be accepted by the requisite number and amount of creditors, nor can assurance be given that the Plan will be confirmed by the Bankruptcy Court.

**Part 9**
**Treatment of Dissenting Classes of Creditors and The Absolute Priority Rule**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class. Debtor will request that the Court confirm or "cram down" the Plan even if creditors holding impaired claims do not accept the Plan. Debtor believes the Bankruptcy Court will confirm the Plan under the circumstances.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Unsecured creditors will not be paid in full under the Plan, and the Equity Holders are proposing to keep their equity in exchange for a contribution of $75,000. If a class of unsecured creditors does not vote to accept the Plan and is not paid in full under the Plan, Equity Holders are unable to keep their equity unless the absolute priority rule is satisfied.

The so-called "absolute priority rule" is set forth in section 1129(b)(2)(B)(ii) of the Bankruptcy Code, and it provides that if a rejecting class of unsecured claims is not paid in full, then "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

Therefore, if a class of creditors votes to reject the Plan, the Equity Holders will not be able to keep their equity in exchange for this contribution unless the Court determines the new value exception to the absolute priority rule is satisfied. The five requirements to satisfy the new value exception to the absolute priority rule are that the new value contribution be: new; substantial; money or money's worth; necessary for a successful reorganization; and reasonably equivalent to the value or interest received.

## Part 10
## Effect of Confirmation

After confirmation, all property of the Debtor shall be free and clear of all claims and interests of creditors except as otherwise provided in the Plan or in the order of the Bankruptcy Court confirming the Plan. The provisions of the Plan shall bind Debtor and all other parties in interest, including any creditor of the Debtor, whether or not such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

## Part 11
## Means for Implementing the Plan

The implementation of, and the distributions required under, the Plan shall be accomplished through the Debtor's continuing operation of its business.

The order confirming the Plan shall have the effect of appointing a Plan Agent, who shall assume the duties of the Examiner. The Plan Agent shall review all financial statements and inventory reports issued by the Debtor and shall otherwise perform the duties of an appointed examiner pursuant to § 1106 of the Bankruptcy Code. The Plan Agent shall collect and distribute any amounts due to the Class 4 Creditors. The Plan Agent shall have authority to seek relief from the Court in all matters related to the interpretation, implementation, consummation, execution, or administration of the confirmed Plan.

On or before fourteen (14) days after the end of each month, the Debtor shall provide the Debtor's secured lender with the financial records for such month, including a balance sheet, profit & loss statement, accounts receivable and accounts payable aging reports, and inventory reports. During the time period covered by the Plan, the Plan Agent will review the Debtor's reports. The Debtor shall have additional reporting duties as described in the Plan.

## Part 12
## Resolution of Doug MacKinnon Receivable

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

The principals of the Debtor currently also own 100% of MacKinnon Holdings, LLC. MacKinnon Holdings, LLC owns the land and building leased by the Debtor for the Debtor's operations. The real estate owned by MacKinnon Holdings is currently encumbered by a $2.2 million real estate loan and the Debtor's $4.5 million line of credit, both with Columbia State Bank. The real estate was recently appraised at $3.4 million. The appraisal was done by the Debtor's secured lender. The secured lender has not provided a copy.

Of the approximately $3 Million owed to the Debtor by its principal, Doug MacKinnon, the Debtor will accept as payment in full all of Doug and Anastasia MacKinnon's ownership interests in MacKinnon Holdings, LLC. This contribution allows for a tax-free repayment of the obligation, lessening the tax burden on the Debtor and the MacKinnons, and encouraging the MacKinnons to work for the Debtor as they will not have a large tax bill to fund.

The transaction also provides the Debtor with additional assets that should encourage other creditors to support the Plan. While the real estate held by MacKinnon Holdings is currently fully encumbered, as the Plan progresses, both pieces of secured debt will decrease, providing the Debtor with potential equity over the life of the Plan. The Debtor's ownership of MacKinnon Holdings, LLC is potentially beneficial to creditors in that in the event the real estate is foreclosed or sold, and excess proceeds are generated, those proceeds belong to the Debtor, not the MacKinnons.

The Debtor accepted this resolution for two reasons. The first is discussed in the section on Liquidation Analysis, which is that the MacKinnons simply do not have the cash to repay the obligation at issue. The second reason is related: the Debtor has determined, with the help of the Debtor's accountant, that almost all of the obligation owed by Doug MacKinnon is attributable to funds that came out of the Debtor and went into the construction of the buildings owned by MacKinnon Holdings. This is why Doug MacKinnon does not have the cash to return to the Debtor, and this is what allows Doug MacKinnon to repay the obligation with his property with no tax consequences – because the distributions were turned into the property, and now the property is being given back to the Debtor.

The Debtor's acceptance of the MacKinnon Holdings, LLC interests is addressed in the treatment of Class 6, Equity Holders.

## Part 13
## Federal Income Tax Consequences of the Plan

The Debtor urges each holder to consult the holder's own tax advisor as to the consequences of the Plan to the holder under federal and applicable state, local, and foreign tax laws. The Debtor and its counsel express no opinion as to the tax consequences of the Plan or the effect thereof on any creditor.

## Conclusion

Debtor has endeavored to obtain the best possible outcome for its creditors in this case, and believes the Plan described above is fair and equitable for all concerned.

DATED April 4, 2018.

DEBTOR'S AMENDED DISCLOSURE STATEMENT

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Respectfully submitted,


By: */s/ Douglas MacKinnon*
     Douglas MacKinnon, President
     47 Hops LLC, Debtor


By: */s/ Nathan T. Riordan*
     Nathan Riordan, WSBA #33926
     Attorney for the Plan Proponent

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Nathan Riordan
WENOKUR RIORDAN PLLC
600 Stewart Street, Suite 1300
Seattle, WA 98101
Direct Dial: (206) 903-0401

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA

| | |
|---|---|
| In Re: | No. 17-02440 |
| 47 HOPS LLC | DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION |
| Debtor. | |

COMES NOW the Debtor herein, 47 HOPS LLC ("Debtor"), through its undersigned attorney, and proposes the following First Amended Plan of Reorganization dated April 3, 2018, pursuant to Section 1121 of Title 11 of the United States Bankruptcy Code:

## ARTICLE 1
## Definitions

As used in the Plan the following terms shall have the respective meanings specified below:

**Administrative Creditor:** Any person entitled to payment of an administrative expense.

**Administrative Expense:** Any cost or expense of administration of the Chapter 11 case allowed under § 503(b) of the Code, including, without limitation, any indebtedness or obligation incurred or assumed by the Debtor, in connection with the conduct of their business in the ordinary course, or for the acquisition or lease of property or for the obtaining of services by the Debtor, all allowances of compensation or reimbursement of expenses to the extent allowed by the Court under the Code, and any fees or charges assessed against the estate of the Debtor.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11    Doc 375    Filed 04/04/18    Entered 04/04/18 15:33:44    Pg 28 of 53

**Allowed Claim:** Any claim against the Debtor as of the Petition Date, proof of which was filed on or before the date designated by the Court as the last date for filing proofs of claim or, if no proof of claim is filed, which has been or hereafter is listed by the Debtor as liquidated in amount and not disputed or contingent and, in either case, a claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Code, the Rules or the Court, or as to which any objection has been interposed and/or such claim has been allowed in whole or in part by an order or judgment of the Court that is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.

**Avoidance Actions:** Any and all Claims and causes of action of the Debtor arising under the Bankruptcy Code, including, without limitation, §§ 544, 545, 547, 548, 549, and 550.

**Bankruptcy Code:** The Bankruptcy Reform Act of 1978 as amended, Title 11, United States Code, including the amendments of the Bankruptcy Consumer Protection Act of 2005.

**Bankruptcy Court:** The United States Bankruptcy Court for the Eastern District of Washington, at Yakima, having jurisdiction over this Chapter 11 Case pursuant to a reference made pursuant to 28 U.S.C. § 157 by the United States District court to the Eastern District of Washington.

**Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure, and as applicable, the Local Rules of Bankruptcy Procedure of the Bankruptcy Court as amended, as applicable to the Chapter 11 Case.

**Cash:** Cash, cash equivalents, and other readily marketable securities or instruments including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest earned or accrued thereon.

**Causes of Action:** Any and all claims, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which the Debtor may hold against any entity, including, without limitation, any causes of action brought prior to the Petition Date, and including actions against any persons for breach of performance, whether the remedy is monetary or for specific performance, related to the Debtor's tangible and intangible interests in real property. This definition does not include any and all causes of action which may exist under §§ 510, 542, 544 through 550, and 553 of the Bankruptcy Code.

**Chapter 11 Case:** The case commenced by Debtor on August 11, 2017, under Chapter 11 of the Code, and pending in the Bankruptcy Court as case number 17-02440.

**Claim:** Any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**Class 1 Creditor:** A Creditor with a Claim classified in Class 1.

**Class 2 Creditor:** A Creditor with a Claim classified in Class 2.

**Class 3 Creditor:** A Creditor with a Claim classified in Class 3.

**Class 4 Creditor:** A Creditor with a Claim classified in Class 4.

**Class 5 Creditor:** A Creditor with a Claim classified in Class 5.

**Confirmation or Confirmation Date:** The date upon which the Bankruptcy Court shall sign the order confirming the Plan or as it may be amended.

**Confirmation Order:** An order of the court confirming the Plan in accordance with the provision of Chapter 11 of the Code which is not then subject to a pending motion to clarify, vacate, rehear, modify, or amend.

**Creditor:** Any person that has a Claim against the Debtor that arose on or before the Petition Date.

**Debtor or Debtor-in-Possession:** 47 Hops LLC.

**Deficiency Claim:** The amount of the Allowed Claim minus the value of the claimant's pro-rated share of its interest in pre- and/or post-petition collateral.

**Disbursing Agent:** The party designated by the Debtor to serve as disbursing agent under this Plan of Reorganization. Initially, this will be 47 Hops LLC.

**Disputed Claim:** A Claim that is listed on the Debtor's Schedules as disputed, contingent, or unliquidated, any Claim as to which the Debtor or any party in interest has interposed an objection in accordance with the Plan, the Bankruptcy Code or the Bankruptcy Rules, or a Claim that is listed on any of the Debtor's Schedules as other than disputed contingent, or unliquidated, but as to which an objection has been filed by the Debtor or any other party in interest prior to the Effective Date, and such objection has not been determined by an order or judgment that is no longer subject to appeal or certiorari proceeding or as to which to appeal or certiorari proceeding is pending.

**Effective Date:** The Effective Date shall be the eleventh (11th) day following entry of the Confirmation Order on the docket of the Bankruptcy Court, provided that said Confirmation Order is not subject to reconsideration or stay pending appeal.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

**Entity:** This term shall have the meaning set forth in § 101(15) of the Bankruptcy Code.

**Impaired:** When used with reference to a Claim, impaired has the meaning of § 1124 of the Bankruptcy Code.

**Hop Dealing Activities:** shall mean the purchase and sale of hops by the Debtor and the entities with common ownership with Debtor, Biorev LLC and SIA Spectre.

**Insider:** This term shall have the meaning set forth in §101(31) of the Bankruptcy Code.

**Loan Balance:** The Allowed Secured Claim of a creditor after reduction for principal and interest paid thereon as of the date of calculation.

**Net Profit:** This term shall mean the amount of revenue in excess of the following: all categories of expenses (Administrative Expenses, Hops Purchases and Operating Expenses) found in the Debtors projections on Exhibit C of the First Amended Disclosure Statement, with the amounts adjusted by Debtor using Debtor's reasonable business judgment, all payments due under the Plan, a reserve for working capital in an amount established by Debtor in Debtor's reasonable business judgment and a reserve for the purchase of hops in an amount established by Debtor in Debtor's reasonable business judgment; the amounts established by the exercise of Debtor's reasonable business judgment with respect to the foregoing must be in amounts agreed upon by the Plan Agent.

**Petition Date:** August 11, 2017, the date on which the Debtor filed a voluntary petition for relief commencing the Chapter 11 case.

**Plan:** This First Amended Plan of Reorganization either in its present form or as it may be altered, amended, or modified from time to time.

**Priority Tax Claim:** A Claim that is entitled to priority of payment under § 507(a)(8) of the Code.

**Profit-Sharing Payment:** shall have the meaning described in Section 7.1.2.

**Rejected Contract Growers:** shall mean the growers on **Exhibit B**.

**Reorganized Debtor:** The Debtor, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

**Unsecured Claim:** Any Claim other than an Administrative Expense, a Priority Tax Claim, priority non-tax claim, secured claim, or claim relating to equity interests in the Debtor.

**Unsecured Creditor:** Any Creditor holding an Unsecured Claim.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

**Unsecured Deficiency Claim:** The unsecured portion, as defined by 11 U.S.C. § 506, of any secured creditor's claim.

**Warehouse:** shall mean the real estate and improvements owned by MacKinnon Holdings, LLC.

**Warehouse Equity:** shall be the fair market value of the Warehouse less all liens and encumbrances and customary closing costs including but not limited to commissions, taxes and escrow fees.

**Warehouse Equity Payment:** shall have the meaning described in Section 7.1.3.

## ARTICLE 2
### Treatment of Administrative Claim and Priority Tax Claims

**2.1** **Full Payment:** Except for those Administrative Expenses incurred in the ordinary course of the Debtor's business which shall be paid in full pursuant to their terms and not under this Plan, each allowed Administrative Expense shall be paid in full by the Reorganized Debtors on the Effective Date or, if required, as soon thereafter as such Administrative Expense is allowed by the Court, or under such other time frame as may be agreed upon between the Reorganized Debtors and the Administrative Creditor.

**2.2** **Contested Administrative Expense:** Administrative Expenses that are contested shall be treated pursuant to Article 12 of the Plan. Administrative Expenses incurred prior to the Confirmation Date will not be allowed unless such Claims are filed with the Court within 30 days of the Effective Date.

**2.3** **Treatment of Priority Tax Claims:** Allowed Priority Tax Claims, if any, will be paid in full either: (a) in equal cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding five (5) years after the Petition Date, with interest calculated at the rate available on ninety (90) day United States Treasury securities; or (b) by the Disbursing Agent according to claim's priority when Plan Distributions are made. Interest on priority tax claims of the Internal Revenue Service shall accrue at the rate set forth in 26 U.S.C. §6621. Furthermore, in the event of default in payments, the Internal Revenue Service may utilize its usual and customary collection procedures. Notwithstanding the foregoing, in the event that Priority Tax Claims are less than $1,000, the Debtor may make a one-time payment on the Effective Date in the full amount of the Priority Tax Claim.

**2.4** **Contested Priority Tax Claim:** Priority Tax Claims that are contested shall be treated pursuant to Article 11 of the Plan.

## ARTICLE 3
### Classification of Claims

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

Claims are classified as follows:

Class 1: Allowed Secured Claim of Columbia State Bank

Class 2: Allowed Secured Claim of Banner Bank

Class 3: Allowed Guaranty Claim of Columbia State Bank

Class 4: Allowed General Unsecured Claims

Class 5: Equity Holders

**ARTICLE 4**
**(Class 1)**
**Provision for the Treatment of Allowed Secured Claim of Columbia State Bank**

Promissory Note Secured by All Inventory and Accounts; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds, as well as the "Additional Lien" on (a) the Debtors' contracts with brewers for the sale of hops, (b) the Debtor's pellet mill and line, and (c) the promissory note owed by Doug MacKinnon to the Debtor (the "Additional Collateral"). The Additional Lien shall secure only the amount of the diminution in the value of the Bank's collateral, if any, as compared to the value as of the Petition Date that occurs as a result of the Debtor's use of cash collateral.

**4.1** **Treatment:** The Class 1 Creditor's Allowed Secured Claim shall be $4,499,833.49, plus expenses of $3,572.76 and any additional expenses due as of the Effective Date, interest accrued and owing through the Effective Date and attorneys' fees and costs of $57,471.62 through March 27, 2018 and all additional reasonable attorneys' fees and costs accrued through the Effective Date, less any payments received by the Class 1 Creditor prior to the date of the confirmation hearing.

The existing security interest shall continue to secure repayment of the Allowed Secured Claim.  No modification in the terms and conditions of the loan documents by and among the Class 1 Creditor and the Debtor, or other security documents, other than the amendment to the payment terms and amount outstanding herein provided, shall occur by virtue of the Plan, except to the extent a term or condition is inconsistent with the terms of the Plan, in which case the Plan terms shall govern. There shall be no prepayment penalty. Except as modified by the terms of the confirmed plan, the terms and conditions of the Debtor's loan documents related to the Class 1 Creditor shall remain in full force and effect.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

**4.1.1 New Principal:** The principal balance shall be the amount of the Allowed Secured Claim (calculated as of the Effective Date).

**4.1.2 New Interest Rate:** The interest rate shall be set at 5.25%.

**4.1.3 New Amortization:** The Allowed Secured Claim shall be paid with interest, compounded monthly for sixty (60) months from the Effective Date. The Debtor will make monthly interest-only payments on or before the 15th of each month. In addition, the Debtor will make the following principal payments on the corresponding dates:

| DATE | AMOUNT |
|------|--------|
| June 15, 2018 | $550,000.00 |
| November 15, 2018 | $536,044.38 |
| May 15, 2019 | $475,000.00 |
| November 15, 2019 | $450,000.00 |
| May 15, 2020 | $450,000.00 |
| November 15, 2020 | $450,000.00 |
| May 15, 2021 | $450,000.00 |
| November 15, 2021 | $450,000.00 |
| May 15, 2021 | $450,000.00 |
| November 15, 2021 | $300,000.00 plus any additional amounts due and owing |
| Total | $4,561,044.38 |

**4.1.4 New Maturity:** The balance of any unpaid principal and interest shall be due in full on the 60-month anniversary of the Effective Date.

**4.1.5 Items Inconsistent:** Where provisions in the note or other documents defining or securing the Class 1 Claim: (1) create a default on account of net worth or other financial ratios, bankruptcy, or insolvency; (2) are inconsistent with the terms of the Plan; or (3) prohibit subordinate liens on the property, such provisions shall not remain in effect.

**4.1.7 Reporting Requirements:**

**4.1.7.1** The Debtor will continue to provide the Class 1 Creditor with any requested financial reports during the life of the Plan. These will include the financial reporting requirements currently set forth in the loan documents as to the Debtor and guarantors as well as (i) monthly financials fourteen (14) days after the end of each month. The financials for each month will include a balance sheet, profit & loss statement, accounts receivable and accounts payable aging reports and inventory report; (ii) monthly inspections of the hops inventory and (iii) a biweekly a report detailing specific hops purchases and sales over the prior two weeks.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

**4.1.7.2** The Debtor will provide the Class 1 Creditor with CPA prepared quarterly financial statements which shall include a include a balance sheet, profit & loss statement, accounts receivable and accounts payable aging reports and inventory report.

**4.1.7.3** The Debtor and Class 1 Creditor will agree upon a process and personal for a monthly inspection on terms satisfactory to the Class 1 Creditor. In the discretion of the Class 1 Creditor, the inventory may be inspected monthly by a third party hired by the Class 1 Creditor. The Debtor will be required to reimburse the Class 1 Creditor for the reasonable costs and fees of the monthly inventory.

    **4.1.8  Guaranties:**

**4.1.8.1** All current guaranties of the Class 1 Claim shall be reaffirmed on the same terms and conditions to the Class 1 Creditor's satisfaction.

**4.1.8.2** MacKinnon Holdings, LLC shall execute a guaranty of the Class 1 Claim on a form and upon terms and conditions satisfactory to the Class 1 Creditor.

    **4.1.9  Additional Liens:** All additional liens placed on real estate owned by MacKinnon Holdings, LLC located at 2301 Oak Avenue, Yakima, WA 98903 and the residence and accompanying real property and improvements of Doug and Anastasia MacKinnon located at 2410 Naches Heights Road, Yakima, WA 98908, shall remain in place.

    **4.1.10 Late Fee:** The late fee charges in the Class 1 Creditor's loan documents shall remain in full force and effect.

    **4.2    Impairment:** Class 1 is impaired under the Plan.

**ARTICLE 5**
**(Class 2)**
**Provision for the Treatment of Allowed Secured Claim of Banner Bank**

Promissory Note Secured by 2007 Freightliner Box Truck

    **5.1    Treatment:** The Class 2 Claim shall be paid as set forth herein. The Class 2 Creditor's Allowed Secured Claim shall be $9,768.57, plus per diem interest, less any payments received by the Class 2 Creditor prior to the date of the confirmation hearing.

    The Class 2 Creditor shall be required to file a verified statement with the Bankruptcy Court setting forth the current balance due under its promissory note. The verified statement must be filed not later than the hearing on Confirmation of the Plan. If no verified statement is filed, then the Allowed Secured Claim shall be the amount set forth in the preceding paragraph, plus per diem interest, less any payments received by the Class 2 Creditor prior to the date of the confirmation hearing.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11   Doc 375   Filed 04/04/18   Entered 04/04/18 15:33:44   Pg 35 of 53

The existing security interest shall continue to secure repayment of the Allowed Secured Claim. No modification in the terms and conditions of the security agreement or other security documents, other than the amendment to the promissory note herein provided, shall occur by virtue of the Plan except to the extent a term or condition is inconsistent with the terms of the Plan, in which case the Plan terms shall govern. There shall be no prepayment penalty. The amendment to the note provides as follows:

**5.1.1 New Principal:** The principal balance shall be the amount of the Allowed Secured Claim (calculated as of the Effective Date).

**5.1.2 New Interest Rate:** The interest rate shall be set at 4.2% or such rate of interest as the Court shall find satisfies the requirement of 11 U.S.C § 1129(b)(2)(A).

**5.1.3 New Amortization:** The Allowed Secured Claim shall be paid with interest, compounded monthly, in fifteen (15) equal monthly payments as of January 12, 2018, with payment made each month thereafter, thereby decreasing the remaining number of payments as of the Effective Date. Payments will commence on the first day of the first full calendar month following the Effective Date and shall be paid on the first day of each month thereafter until paid in full.

**5.1.4 New Maturity:** The balance of any unpaid principal and interest shall be due in full on the 60-month anniversary of the Effective Date.

**5.1.5 Items Inconsistent:** Where provisions in the note or other documents defining or securing the Class 2 Claim: (1) create a default on account of net worth or other financial ratios, bankruptcy, or insolvency; (2) are inconsistent with the terms of the Plan; or (3) prohibit subordinate liens on the property, such provisions shall not remain in effect.

**5.1.6 Automatic Stay:** To the extent that the automatic stay has been lifted prior to the Effective Date, on the Effective Date all defaults shall be deemed cured.

**5.2    Impairment:** Class 2 is impaired under the Plan.

### ARTICLE 6
### (Class 3)
### Provision for the Treatment of Allowed Guaranty Claim of Columbia State Bank

Secured by Real Property Owned by MacKinnon Holdings, LLC

**6.1    Treatment:** The Class 3 Creditor will not receive any distribution unless the principal obligor of the underlying debt has defaulted. The Class 3 Creditor shall be required to provide written notice to the Debtor of any default by the principal obligor on the underlying debt. The Class 3 Creditor shall provide further notice of the disposition of any collateral, and the amount of any remaining deficiency claim, which claim shall then be entitled to treatment

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

under Class 4, but only with respect to distributions made after the Class 3 Creditor has established a deficiency claim.

**6.2**   **Impairment:** Class 3 is impaired under the Plan.

### ARTICLE 7
### (Class 4)
### Treatment of General Allowed Unsecured Claims

**7.1**   **Treatment:** The Class 4 Creditors shall receive payments, distributed pro rata, as follows:

    **7.1.1**   **Scheduled Payments:** The Class 4 Creditors shall receive the following payments, distributed pro rata, on the corresponding dates:

| DATE | AMOUNT |
|------|--------|
| June 15, 2018 | $55,000 |
| November 15, 2018 | $55,000 |
| May 15, 2019 | $50,000 |
| November 15, 2019 | $50,000 |
| May 15, 2020 | $55,000 |
| November 15, 2020 | $55,000 |
| May 15, 2021 | $55,000 |
| November 15, 2021 | $55,000 |
| May 15, 2022 | $55,000 |
| November 15, 2022 | $55,000 |
| Total | $550,000 |

    **7.1.2**   **Profit-Sharing Payments:** The Class 4 Creditors shall receive forty-five percent (45%) of Net Profit, if any, distributed pro rata, on all Hop Dealing Activities of the Debtor for the fiscal years 2018, 2019, 2020, 2021, and 2022 after working capital, taxes, an appropriate and agreed upon cash reserve to be used for hop purchases, and all Plan payments have been made. The Plan Agent will certify the dollar amount based on tax and financial records for any year in question. Profit-Sharing Payments will be made to the Class 4 Creditors within 30 days after all necessary taxes have been paid to the IRS for each fiscal year.

    **7.1.3**   **Warehouse Equity Payment:** The Class 4 Creditors shall receive a payment equal to forty percent (40%) of the Warehouse Equity, distributed pro rata (the "Warehouse Equity Payment"). The Equity Payment shall be due five (5) years after the Effective Date of the Plan.

    **7.1.3.1 Cap:** The Warehouse Equity Payment shall be capped at Four Hundred Thousand Dollars ($400,000).

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

    **7.1.3.2 Estimated Equity**: At the conclusion of the Plan, if the Debtor demonstrates to the Plan Agent that the fair market value of the Warehouse has declined for reasons outside the Debtor's control, the Warehouse Equity Payment shall be forty percent (40%) of the actual estimated equity in the Warehouse as certified by the Plan Agent at that time.

    **7.1.3.3 Equity Payment Financing Option:** In the event the Debtor does not have the cash available or cannot secure financing to make the Warehouse Equity Payment, the Debtor shall have the option of treating the Warehouse Equity Payment as an obligation that may be paid at a fixed interest rate to be calculated at New York prime plus 1.5%, compounded annually, amortized over fifteen (15) years with a balloon payment of the principal obligation due within three (3) years, which may also be paid at any time prior to that without penalty.

    **7.1.3.4 Lien:** The Class 4 Creditors shall receive a lien on the Warehouse and a lien on the ownership interests of the Debtor to secure payment of the Equity Claim and to act as a due on sale clause.

    **7.1.4 Plan Agent:** All payments made by the Debtor pursuant to this section shall be collected by the Plan Agent and distributed pro rata to the Class 4 Creditors after deducting the Plan Agent's costs and fees incurred by such collection and distribution.

  **7.2  Impairment:** Class 4 is impaired under the Plan.

**ARTICLE 8**
**(Class 5)**
**Treatment of Equity Holders**

  **8.1  Treatment:** The Class 5 Equity Holders shall retain their equity in exchange for a payment of $75,000 to the Debtor within thirty (30) days after the Effective Date. Further, the Class 5 Equity Holders shall resolve any and all obligations owed to the Debtor by transferring their ownership of MacKinnon Holdings, LLC to the Debtor within ten (10) business days after the Effective Date.

  **8.2  Impairment:** Class 5 is impaired under the Plan.

**ARTICLE 9**
**Implementation of the Plan**

  **9.1  Means:** The implementation of, and the distributions required under, this Plan shall be accomplished through the Debtor's normal business operations.

  **9.2  Plan Agent:** The order confirming the Plan shall have the effect of appointing the Plan Agent. The Plan Agent shall review all financial statements and inventory reports

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11  Doc 375  Filed 04/04/18  Entered 04/04/18 15:33:44  Pg 38 of 53

issued by the Debtor and shall otherwise perform the duties of an appointed examiner pursuant to § 1106 of the Bankruptcy Code. The Plan Agent shall collect and distribute any amounts due to the Class 4 Creditors. The Plan Agent shall have authority to seek relief from the Court in all matters related to the interpretation, implementation, consummation, execution, or administration of the confirmed Plan.

**9.3** **Rejected Contract Growers:** During the term of the Plan, the Debtor shall offer to purchase hops from the Rejected Contract Growers as follows:

**9.3.1** If fewer than all Rejected Contract Growers participate:

**9.3.1.1** The percentage to which each Rejected Contract Grower shall be entitled will be adjusted by dividing each participating Rejected Contract Grower's original percentage by the total of the percentages of all participating Rejected Contract Growers (the "adjusted percentage"). That number will be multiplied by the number of pounds of the desired purchase (the "adjusted volume").

**9.3.1.2** If a participating Rejected Contract Grower's adjusted volume results in a greater volume of hops than an individual participating Rejected Contract Grower has available from its own production, the remaining participating Rejected Contract Growers may deliver the requested additional volume.

**9.3.2** If the Rejected Contract Growers do not have sufficient hops available from their own production to fill the total volume of the purchase request, the Debtor may purchase the additional volume needed from other sources.

**9.3.3** The Debtor will pay all participating Rejected Contract Growers the same purchase price on a fulfillment request on any given variety on a per pound basis of hops.

**9.3.4** The compensation rate from raw hops to pellets (if necessary for calculation purposes) shall be $0.40 per pound of raw hops.

## ARTICLE 10
### Executory Contracts and Unexpired Leases

**10.1** **Assumption and Rejection:** On the Effective Date, the Debtor will assume the executory contracts and unexpired leases identified on **Exhibit A** attached to the Plan ("Plan Exhibit A"). The Debtor may amend Plan Exhibit A until commencement of the hearing on confirmation of the Plan. Any executory contracts and unexpired leases not identified on Plan Exhibit A, as may be amended, shall be rejected, unless otherwise assumed by separate motion. The Debtor will give prompt notice to any party whose treatment is changed pursuant to this provision.

**10.2** **Procedure for Cure:** No later than ten (10) days prior to the Confirmation Date, all parties to executory contracts and unexpired leases identified on Plan Exhibit A shall file

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

and serve on the Debtor a "Statement of Cure," which shall set forth in detail all amounts necessary to: (i) cure any default or breach (except those types of defaults specified in Bankruptcy Code § 365(b)(2)) as of the Confirmation Date, and (ii) compensate the party for any actual pecuniary loss resulting from any defaults as of the Confirmation Date.  The party filing the Statement of Cure shall be bound by the amounts claimed therein and may not amend the Statement of Cure after the deadline.  Any party to a contract identified on Plan Exhibit A not timely filing a Statement of Cure shall be deemed to have waived any claim against the Debtor for any amounts necessary to either cure any default or compensate the party for any actual pecuniary loss resulting from any defaults as of the Confirmation Date which exceed the amounts shown on Debtor's books.

Executory contracts assumed by prior order of the Bankruptcy Court, if any, are not included on Plan Exhibit A.

**10.3     Payment of Cure:** The Debtor will pay all cure amounts by providing the claimant with credit for the amount of the party's claim, to be applied to the claimant's next payment due under the contract between the Debtor and the party. If the cure amounts exceed what the Debtor anticipated would be the cure amounts, then the Debtor may elect to reject such unexpired lease or executory contract, notwithstanding its inclusion on Plan Exhibit A.

**10.4     Rejection Claims:** Claims, if any, arising from the rejection of an executory contract or unexpired lease must be filed within twenty (20) days after the Effective Date.

## ARTICLE 11
## Procedure for Resolving Contested Claims

**11.1     Objections to Claims:** Objections to Claims and Administrative Expenses shall be made and served upon each holder of such Claims to which objections are made and filed with the Court within sixty (60) days of the Effective Date; provided, however, that the deadline may be extended upon *ex parte* motion to the Court.

**11.2     Prosecution of Objections to Claims:** The objecting party shall litigate to judgment, settle, or withdraw objections to contested Claims and Administrative Expenses.  No distribution shall be made to any Creditor or holder of an Administrative Expense while an objection to the Claim or Administrative Expense shall be reserved and retained by the Reorganized Debtor, and the remaining distributions to the class which includes the contested Claim or Administrative Expenses shall be reduced by the amount of the contested Claim or Administrative Expense.  Creditors and holders of Administrative Expenses, whose Claims and Administrative Expenses become Allowed Claims or allowed Administrative Expenses, shall receive the reserved distributions as soon as practical after they become allowed.

**11.3     Late Filed Claims:** Unless otherwise ordered by the Bankruptcy Court upon motion and notice, any proof of Claim filed after the Confirmation Date shall be automatically disallowed as a late filed Claim without further action by the Reorganized Debtor unless the Creditor obtains an order of the Court authorizing and allowing the late filed claim.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11     Doc 375     Filed 04/04/18     Entered 04/04/18 15:33:44     Pg 40 of 53

**11.4** **Disputed Claims:** Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of any disputed Claim until such Claim becomes an Allowed Claim, and then only to the extent it becomes an Allowed Claim. The Debtor shall reverse and retain distributions that would otherwise be paid to the Creditor or holder of an Administrative Expense prior to the allowance of a Claim or Administrative Expense. Creditors and holders of Administrative Expenses whose Claims and Administrative Expenses become Allowed Claims or allowed Administrative Expenses shall receive the reserved distributions immediately after their Claim or Administrative Expenses becomes an Allowed Claim or allowed Administrative Expense.

## ARTICLE 12
### Miscellaneous Provisions

**12.1** **Termination of the Plan:** The Plan shall terminate and otherwise cease to be of any force or effect upon satisfaction of all of the Plan's terms and upon completion of all distributions required under the Plan.

**12.2** **Modification of Plan:** The Debtor may propose amendments or modifications to the Plan at any time prior to Confirmation. After Confirmation, the Reorganized Debtor may, with leave of court and so long as it does not materially or adversely affect the interest of Creditors or other parties in interest, remedy any defect or omission or reconcile any inconsistency in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes, intent, and effect of the Plan.

**12.3** **Undeliverable Distributions:** Any distribution returned to the Debtor as undeliverable shall be held for six (6) months. Debtor shall make reasonable efforts to locate the holder of an Allowed Claim entitled to such distribution. After six (6) months, if no holder of an Allowed Claim asserts a claim for the undeliverable distribution, it shall become property of the Debtor's bankruptcy estate and no further distributions shall be made to the Creditor.

**12.4** **Post-confirmation Obligations for Reporting and Fees**. The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 USC § 1930(a)(6) until the case is closed, converted, or dismissed. The Reorganized Debtor shall serve on the United States Trustee a monthly disbursement report for each month, or portion thereof, that the case remains open. The post-confirmation monthly disbursement report shall include a statement of all disbursements made during the course of the month, whether or not pursuant to the Plan. In addition, the Reorganized Debtor shall timely file all quarterly post-confirmation disbursement reports required by LBR 3021-1.

## ARTICLE 13
### Retention of Jurisdiction

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11     Doc 375     Filed 04/04/18     Entered 04/04/18 15:33:44     Pg 41 of 53

The Court shall retain jurisdiction of this Chapter 11 case pursuant to the provisions of the Code, until and subject to further order of the Court; specifically, the Court shall retain jurisdiction to hear or determine the following matters:

**13.1**   To enable the Debtor to consummate any and all proceedings which may be brought prior to or subsequent to the Confirmation Order.

**13.2**   To consider actions to avoid, set aside, or otherwise determine the extent, validity, and priority of liens or encumbrances.

**13.3**   To consider objections to Claims or the allowance thereof.

**13.4**   To consider actions for the recovery of assets (including but not limited to accounts) or damages as entitled under the applicable provisions of the Code or other federal, state, or local law, including but not limited to actions based on any *ultra vires* pre-petition acts of the Debtor.

**13.5**   To prosecute to resolution all related contested matters or adversary proceedings pending on the Confirmation Date or filed in the Court thereafter.

**13.6**   To issue injunctions or take such other actions or make such other orders as may become necessary or appropriate to restrain interference with the Plan or its execution or implementation; to take any action to enforce and execute the Plan, the Confirmation Order, or any other order of the Court; and to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan.

**13.7**   To determine all matters that may be pending before the Court on or before the Effective Date.

**13.8**   To classify, allow, or disallow Claims and the direct distribution of funds under the Plan, and to adjudicate all controversies concerning the classification, treatment, or allowance of any Claim.

**13.9**   To enforce performance of the Plan.

**13.10**  To hear and determine all Claims arising from the rejection of executory contracts and unexpired leases and to consummate the rejection and termination thereof.

**13.11**  To liquidate damages in connection with any disputed, contingent, or unliquidated Claims.

**13.12**  To recover all assets and properties of the estate wherever located.

**13.13**  To hear and determine matters concerning state, local, and federal taxes.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

**13.14** To determine any and all applications for allowance of pre-confirmation compensation and expense reimbursement of professionals or other Administrative Expense claimants.

**13.15** To resolve any dispute related to the implementation, execution, consummation, or interpretation of the Plan or Confirmation Order and the making of distributions under this Plan.

**13.16** To resolve any dispute related to the scope of duties or powers, including those related to compensation or retention of employees or professionals of the Debtor.

**13.17** To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigation instituted in this case by or on behalf of the Debtor.

**13.18** To hear actions required to protect the property of the Debtor from adverse Claims or interference inconsistent with this Plan, including actions to quiet or otherwise clear title to such property based upon the terms and provisions of this Plan.

**13.19** To hear and determine such other matters and make such orders as are necessary and appropriate to carry out the provisions of the Plan. The powers of this Court shall be broadly and liberally construed.

**ARTICLE 14**
**Events of Default**

In the event the Debtor defaults under the provisions of the Plan as confirmed, any Creditor holding an Allowed Claim and desiring to assert such a default shall provide all parties listed in Article 15 with written notice of the alleged default. The Debtor shall have ten (10) days from receipt of the written notice in which to cure the default. Such notice shall be delivered by United States mail to the parties at the addresses set forth in Article 15. If a default is not cured, such Creditor providing notice may thereafter pursue such applicable legal remedies as may be appropriate.

**ARTICLE 15**
**Notices**

| | |
|---|---|
| Wenokur Riordan PLLC<br>Attn: Nathan Riordan<br>600 Stewart Street, Suite 1300<br>Seattle, WA 98101<br>*Counsel for Debtor* | 47 Hops LLC<br>P.O. Box 10747<br>Yakima, WA 98909 |
| Plan Agent<br>TBD | |

DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

1

WHEREFORE the Debtor prays for confirmation of the Plan pursuant to 11 U.S.C. § 1129 and for such other and further relief as is just, proper, and equitable.

Dated April 4, 2018.

Respectfully submitted,

47 HOPS LLC

By: */s/ Douglas MacKinnon*
    Douglas MacKinnon, Member

Dated April 4, 2018.

WENOKUR RIORDAN PLLC

By: */s/ Nathan Riordan*
    Nathan Riordan, WSBA #33926
    Attorney for the Plan Proponent

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

**PLAN EXHIBIT A**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED**

**Leases:**

1.  Lease Agreement between MacKinnon Holdings and 47 Hops LLC for the warehouse located at 2301 Oak Avenue, Yakima, WA 98903.

2.  Lease Agreement between Marina D. Guryanova and 47 Hops LLC for the premises at 2516 South 23rd Avenue, Yakima, WA 98903.

**Hop Sales Contracts:**

| Customer | Crop Years | Contract No. |
|---|---|---|
| 8th Wonder Brewery | 2014-2018 | 47-1418-377 |
| Able Seedhouse and Brewery | 2015-2017 | 47-1517-853 |
| Alvarado Street Brewery | 2014-2018 | 47-1418-552 |
| Alvarado Street Brewery | 2015-2020 | 47-1418-599 |
| Angry Erik Brewing | 2016-2018 | 47-1618-767 |
| Appalachian Mountain Brewery, LLC | 2013-2017 | 47-1317-268 |
| Arizona Wilderness Brewing | 2015-2017 | 47-1517-563 |
| Assawoman Bay Brewing Co. | 2015-2018 | 47-1418-375R |
| Bad Jimmy's Brewing Co. | 2013-2017 | 47-1317-272 |
| Baere Brewing Co. | 2016-2020 | 47-1620-916 |
| Ballad Brewing LLC | 2016-2018 | 47-1618-799 |
| Barley Forge Brewing Company | 2015-2018 | 47-1517-546R |
| Bearded Iris Brewing Company | 2015-2017 | 47-1517-633 |
| Bearded Iris Brewing Company | 2015-2017 | 47-1517-686 |
| Bent River Brewing Co. | 2016-2018 | 47-1618-862 |
| Berkley Beer Company | 2015-2018 | 47-1518-750 |
| Berkshire Brewing Co. | 2015-2019 | 47-1519-594 |
| Big Rack Brew Haus | 2016-2018 | 47-1618-883 |
| Big Timber Brewing | 2013-2017 | 47-1317-286 |
| Big Timber Brewing | 2014-2018 | 47-1418-398 |
| Bitter Brothers Brewing Co. | 2016-2017 | 47-1617-819 |
| Black Sands Brewing Co. | 2014-2018 | 47-1418-359 |
| Bog Iron Brewing Company | 2017-2020 | 47-1720-845 |

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11   Doc 375   Filed 04/04/18   Entered 04/04/18 15:33:44   Pg 45 of 53

| | | |
|---|---|---|
| Bowigens Beer Company | 2014-2018 | 47-1418-414 |
| Branchline Brewing Co. | 2015-2017 | 47-1517-601 |
| Branchline Brewing Co. | 2015-2017 | 47-1517-748 |
| Brasserie Dunham | 2014-2020 | 47-1420-836 |
| Brew Culture Inc. | 2016-2017 | 47-1617-308R |
| Bright Ideas Brewing | 2015-2017 | 47-1517-791 |
| Broad Street Brewing | 2013-2017 | 47-1317-331 |
| Buffalo Bayou Brewing Co. | 2015-2017 | 47-1517-547 |
| Canton Brew Works, LLC | 2013-2017 | 47-1317-328 |
| Canton Brew Works, LLC | 2014-2018 | 47-1418-329 |
| Catskill Brewing Co. | 2017 | 47-17-861 |
| Central Standard Brewing | 2016-2018 | 47-1618-731 |
| Cerebral Brewing | 2017-2021 | 47-1721-826 |
| Cerveceria Encino | 2013-2017 | 47-1317-297R |
| Cerveceria Mamut | 2015-2017 | 47-1517-558 |
| Chapman Crafted Beer Company | 2013-2017 | 47-1317-271R-2 |
| Chattahoochee Brewing Company | 2015-2019 | 47-1416-560 |
| Chestnut Brew Works, LLC | 2014-2018 | 47-1418-402 |
| Chestnut Brew Works, LLC | 2016-2018 | 47-1418-792 |
| Clipper City Brewing | 2014-2018 | 47-1418-394 |
| Clipper City Brewing | 2015-2019 | 47-1519-395 |
| Community Beer Company | 2015-2019 | 47-1416-466R |
| Comrade Brewing Company | 2015-2017 | 47-1517-589 |
| Coronado Brewing Co. | 2015-2017 | 47-1517-816 |
| Cottrell Brewing Co. | 2014-2017 | 47-1416-544 |
| Council Brewing Company | 2015-2020 | 47-1518-848 |
| Crime & Punishment Brewing Co. | 2015-2017 | 47-1517-644 |
| Crucible Brewing | 2015-2017 | 47-1517-580R |
| D9 Brewing Co. | 2013-2017 | 47-1317-345 |
| D9 Brewing Co. | 2013-2017 | 47-1317-364 |
| Dark Sky Brewing Company | 2014-2017 | 47-1517-525 |
| Dark City Brewing Company | 2017-2018 | 47-1718-1006 |
| DeBine Brewing Co. | 2017-2018 | 47-1718-868 |
| Deep Water Brewing Co. | 2013-2017 | 47-1317-292 |
| Disegna Group Di Lunardon Domenico | 2016-2017 | 47-17-1037 |

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11   Doc 375   Filed 04/04/18   Entered 04/04/18 15:33:44   Pg 46 of 53

| | | |
|---|---|---|
| Door County Brewing | 2017-2019 | 47-17-811 |
| Door County Brewing | 2016-2018 | 47-1618-811 |
| DT Brewing Co. | 2014-2018 | 47-1418-378 |
| Due South Brewing Co. | 2015-2017 | 47-1517-513R |
| Eagle Rock Brewery | 2016-2017 | 47-1617-407R2 |
| Emmett's Brewing Co. | 2015-2017 | 47-41517-693-REVISED |
| Engine House No. 9 Brewing Co. | 2015-2019 | 47-1419-400 |
| Eureka Heights Brewing Company | 2016-2019 | 47-1619-679R |
| Figueroa Mountain Brewing, LLC | 2018-2022 | 47-1822-1005 |
| Fonta Flora Brewing Co. | 2014-2018 | 47-1418-296 |
| Fonta Flora Brewing Co. | 2014-2018 | 47-1418-389 |
| Fort George Brewery | 2015-2017 | 47-1517-508 |
| Four Corners Brewing | 2016-2020 | 47-1620-870 |
| Four Sons Brewing | 2017-2018 | 47-1718-348 |
| Four Sons Brewing | 2017-2018 | 47-1718-586 |
| Four Sons Brewing | 2016-2019 | 47-1619-504 |
| Freak N' Brewing Company | 2016-2017 | 47-1617-291R |
| Front Range Hop Company | 2013-2018 | 47-1318-428 |
| Front Range Hop Company | 2014-2018 | 47-1418-475 |
| Front Range Hop Company | 2014-2018 | 47-1418-495 |
| Funky Buddha Brewery | 2014-2018 | 47-1418-322 |
| Ghost Train Brewing Co., Inc. | 2016-2018 | 47-1618-938 |
| Goldhorn Brewery | 2014-2017 | 47-1417-506 |
| Goshen Brewing | 2016-2021 | 47-1621-847 |
| Great Basin Brewing Co. | 2015-2017 | 47-1517-533R |
| Great Basin Brewing Co. | 2016-2021 | 47-1621-942 |
| Great Basin Brewing Co. | 2013-2017 | 47-1317-255 |
| Griffin Claw Brewing Company | 2016-2018 | 47-1618-878 |
| Half Moon Bay Brewing Company | 2014-2018 | 47-1317-301 |
| Hardywood Park Craft Brewery | 2013-2017 | 47-1318-298 |
| Hardywood Park Craft Brewery | 2013-2018 | 47-1318-384R |
| Hardywood Park Craft Brewery | 2013-2018 | 47-1418-464R |
| Headlands Brewing Co. | 2013-2018 | 47-1318-299 |
| Headlands Brewing Co. | 2014-2018 | 47-1318-300 |
| Headlands Brewing Co. | 2014-2018 | 47-1418-429 |

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

| | | |
|---|---|---|
| Hermitage Brewing Co. | 2014-2018 | 47-1418-339 |
| High Hops Brewery | 2014-2018 | 47-1418-439 |
| High Hops Brewery | 2016-2018 | 47-1618-678 |
| Holy Mountain Brewing Company | 2013-2017 | 47-1317-433 |
| Holy Mountain Brewing Company | 2015-2019 | 47-1419-392A |
| Home Beer Wine Cheese | 2014-2018 | 47-1418-584 |
| Home Beer Wine Cheese | 2015-2018 | 47-1518-694 |
| Home Beer Wine Cheese | 2014-2018 | 47-1418-275 |
| HopHouse Brewing Supply | 2013-2018 | 47-1318-376 |
| HopHouse Brewing Supply | 2013-2018 | 47-1318-379 |
| Hutton & Smith Brewing | 2017-2020 | 483R-1720 |
| Island Brewing Co. | 2015-2020 | 47-1520-820R |
| Kirkwood Station Brewing | 2013-2017 | 47-1317-401 |
| La Cabra Brewing | 2015-2017 | 47-1517-657 |
| La Cabra Brewing | 2016-2018 | 47-1618-770 |
| Lickinghole Creek Craft Brewery | 2013-2017 | 47-1317-349 |
| Lionstone Brewing Co. | 2015-2017 | 47-1517-583 |
| Logboat Brewing Company | 2015-2020 | 47-1617-551R |
| Lord Hobo Brewing Company | 2014-2017 | 47-1417-462 |
| Lost 40 Brewery | 2017-2019 | CBC16-029 |
| Lucky Town Brewing Co. | 2014-2018 | 47-1418-434 |
| Lucky Town Brewing Co. | 2014-2018 | 47-1418-521 |
| Lucky Town Brewing Co. | 2014-2018 | 47-1418-408 |
| Manor Hill Brewing | 2014-2019 | 47-1418-467 |
| Manor Hill Brewing | 2015-2018 | 47-1518-718 |
| Manor Hill Brewing | 2015-2018 | 47-1519-607 |
| McKenzie Brew House | 2016-2018 | 47-1618-943 |
| Modern Times Beer | 2013-2018 | 47-1318-307 |
| Modern Times Beer | 2014-2018 | 47-1418-308 |
| Motorworks Brewing Co. | 2013-2018 | 47-1317-303R |
| Moustache Brewing Co | 2016-2018 | CBC16-040 |
| Mudshark Brewery | 2016-2018 | 47-1618-865 |
| Music City Brew Supply | 2015-2019 | 47-1519-648 |
| New Bohemia Brewing Co. | 2014-2018 | 47-1418-386 |
| New Province Brewing | 2015-2018 | 47-1518-669A |

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

| | | |
|---|---|---|
| NOLA Brewing Company | 2013-2018 | 47-1318-314 |
| NOLA Brewing Company | 2014-2018 | 47-1418-315 |
| Ocelot Brewing Company | 2016-2018 | 47-1618-763 |
| Ocelot Brewing Company | 2016-2018 | 47-1618-766 |
| Ornery Beer Company | 2015-2017 | 47-1517-576R |
| Osgood Brewing, LLC | 2014-2018 | 47-1418-264B |
| Pabst Brewing Co. | 2015 | Multiple |
| Peter B's BrewPub | 2015-2017 | 47-1517-559 |
| Powerhouse Brewery | 2015-2019 | 47-1519-474 |
| Ratio Beerworks | 2015-2018 | 47-1418-591R |
| Realerevival Brewing | 2014-2018 | 47-1418-332 |
| Realerevival Brewing | 2014-2018 | 47-1418-340 |
| Red Cypress Brewery | 2015-2018 | 47-1518-765 |
| Red Hills Brewing Company | 2015-2018 | 47-1517-701 |
| Red Horn Coffeehouse Brewing Co. | 2017-2019 | CBC16-036 |
| Reformation Brewery | 2015-2017 | 47-15-17-564 |
| Revolver Brewing | 2015-2019 | 47-1416-539 |
| Right Proper Brewing Co. | 2016-2020 | 47-1619-436R |
| Rockingham Brewing Company | 2014-2018 | 47-1418-456 |
| Scott Laboratories Ltd. | 2017-2019 | 47-1719-566 |
| Scott Laboratories Ltd. | 2017-2018 | 47-1718-777 |
| Scottsdale Beer Company | 2014-2019 | 47-1419-412 |
| Scottsdale Beer Company | 2016-2018 | 47-1518-758R |
| Silver City Brewery | 2016-2018 | 47-1618-849 |
| Singlecut Beersmiths | 2015-2020 | 47-1520-859R |
| Six Ten Brewing | 2016-2018 | CBC16-005 |
| Skewed Brewing | 2013-2017 | 47-1317-387 |
| Skewed Brewing | 2013-2017 | 47-1417-431 |
| Skewed Brewing | 2014-2018 | 47-1418-397 |
| Skewed Brewing | 2015-2018 | 47-1518-554 |
| Skewed Brewing | 2013-2017 | 47-1317-281 |
| Skewed Brewing | 2014-2018 | 47-1418-282 |
| Skookum Brewery | 2014-2017 | 47-1417-515 |
| Skookum Brewery | 2015-2020 | 47-1520-746 |
| Skookum Brewery | 2016-2020 | 47-1620-671 |

DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

17-02440-FLK11   Doc 375   Filed 04/04/18   Entered 04/04/18 15:33:44   Pg 49 of 53

| | | |
|---|---|---|
| Skookum Brewery | 2018-2020 | 47-1820-622 |
| Solemn Oath Brewery | 2016-2018 | 47-1618-784 |
| Sound Brewery | 2015-2018 | 47-1518-578R |
| Springfield Brewing Co. | 2013-2017 | 47-1317-323 |
| St. Florian's Brewery | 2013-2017 | 47-1317-294 |
| St. Florian's Brewery | 2014-2018 | 47-1418-404 |
| Stone Brewing Company | 2017 | 47-17-606 |
| Stone Brewing Company | 2014-2018 | 47-1418-316 |
| Stone Brewing Company | 2014-2018 | 47-1418-318 |
| Stone Brewing Company | 2014-2018 | 47-1418-330 |
| Stone Brewing Company | 2014-2018 | 47-1418-350 |
| Stone Brewing Company | 2014-2018 | 47-1420-893 |
| Stone Brewing Company | 2015-2019 | 47-1519-319 |
| Stone Brewing Company | 2015-2020 | 47-1520-550 |
| Straight to Ale | 2013-2017 | 47-1317-321 |
| Straight to Ale | 2015-2017 | 47-1517-604 |
| Take 16 Brewing Company | 2013-2017 | 47-1317-420R |
| TecBeer Com. Distr. Import | 2015 | 47-15-536 |
| TecBeer Com. Distr. Import | 2016-2019 | 47-1619-843 |
| Tenaya Creek Brewery | 2013-2017 | 47-1317-312 |
| Tenaya Creek Brewery | 2014-2018 | 47-1418-313 |
| The Dudes' Brewing Company | 2015-2019 | 47-15-562 |
| The Hourglass Brewery | 2016-2018 | 47-1618-867 |
| The Knuckle Brewing Company | 2016-2018 | 47-1619-894 |
| The Virginia Beer Company | 2015-2021 | 47-1521-842 |
| Three Palms Brewing | 2014-2018 | 47-1418-290 |
| Transmitter Brewing | 2015-2017 | 47-1517-556 |
| Triple C Brewing Co. | 2014-2018 | 47-1418-279 |
| Triple Voodoo Brewery & Tap Room | 2015-2017 | 47-1517-643 |
| Tuckahoe Brewing Company | 2015-2020 | 47-1520-832 |
| Turoni's Main Street Brewery | 2016-2020 | 47-1620-798 |
| Turoni's Main Street Brewery | 2013-2017 | 47-1317-293 |
| Turoni's Main Street Brewery | 2014-2018 | 47-1418-367 |
| Twisted Vine Brewery | 2013-2017 | 47-1317-353 |
| Uinta Brewing | 2013-2018 | 47-1317-354 |

**DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION**

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

| | | |
|---|---|---|
| Unsung Brewing Company | 2015-2018 | 47-1518-825 |
| Urban Growler Brewing Company | 2015-2017 | 47-1517-590 |
| Vancouver Island Brewery | 2013-2017 | 47-1317-287 |
| Vernal Brewing Company | 2015-2017 | 47-1517-682 |
| Wandering Star Brewing Co. | 2013-2017 | 47-1317-302 |
| Wellington Brewery | 2016-2018 | 47-1618-371R3 |
| Wet Coast Brewing Company | 2015-2018 | 47-1518-684 |
| Whalers Brewing Company | 2017 | 851R-17 |
| Whole Foods Market Brewing | 2015-2017 | 47-1517-579 |
| Wicks Brewing Company | 2014-2018 | 47-1418-304R |
| Wicks Brewing Company | 2014-2018 | 47-1418-305 |
| Wicks Brewing Company | 2014-2018 | 47-1418-417R |
| Wicks Brewing Company | 2014-2018 | 47-1518-304A-R |
| Wicks Brewing Company | 2015-2018 | 47-1518-358/Addition |
| Wisconsin Dells Brewing Co. | 2013-2017 | 47-1317-295 |
| Wood Grain Brewing Co. | 2015-2018 | 47-1517-667 |
| Wops Hops Brewing Co. | 2014-2018 | 47-1416-44 |
| Wops Hops Brewing Co. | 2014-2018 | 47-1416-446 |
| Wops Hops Brewing Co. | 2014-2019 | 47-1419-385R |
| Zero Issue Brewing | 2017 | 47-17-897 |
| Zipline Brewing Co. | 2017-2018 | 47-1718-721 |

WENOKUR RIORDAN PLLC
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

# PLAN EXHIBIT B

## LIST OF REJECTED CONTRACT GROWERS

1. Annen Bros., Inc.

2. CLS Farms LLC

3. Cornerstone Ranches, LLC

4. DER Hops LLC

5. Green Acre Farms Inc.

6. Obendorf Hop Inc.

7. Organic Hops Northwest, LLC

8. Roy Farms, Inc.

9. Slohops d.o.o.

10. Stan Brulotte Loza Farms Inc.

11. Top Hop Ltd.

12. Wyckoff Farms Inc.

**WENOKUR RIORDAN PLLC**
ATTORNEYS AT LAW
600 STEWART STREET, SUITE 1300
SEATTLE, WASHINGTON 98101
206.682.6224 (WENOKUR)
206.903.0401 (RIORDAN)

LF 3018 c (8/2010)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In re:  47 HOPS LLC,                      Case No.   17-02440

                  Debtor.

**BALLOT FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION**

1.     The Plan of Reorganization referred to in this ballot was filed by
   the Debtor, 47 HOPS LLC, _____ on ___April 3, 2018_____ .
   The Plan of Reorganization can be confirmed by the court and thereby made binding on
   you if it is accepted by the holders of two-thirds in amount and more than one-half in
   number of claims in each class.   In order for your vote to count, you must complete and
   return this ballot within the time set forth below.

2.     The undersigned, a creditor or equity security holder of the above-named debtor,

   ☐   **ACCEPTS**
                     (Check only one)
   ☐   **REJECTS**

   the Plan of Reorganization for the Debtor.

3.     The Plan of Reorganization places my claim or interest in Class No. _____.

4.     Name of creditor or
   equity security holder: _____
                                       (Type or print)

                  By: _____
                                     (Signature)

5.     Address of creditor
   or equity security holder: _____

                     _____

6.     Return ballot on or before ___May 4, 2018___ to:   Nathan Riordan
                                                     600 Stewart Street, Suite 1300

                                                     Seattle, WA  98101